[No. 80020-1.   En Banc.]
Argued March 18, 2008.      Decided November 26, 2008.

THE STATE OF WASHINGTON, *Respondent*, v. LEAA'ESOLA UNGA, *Petitioner*.

*Dana M. Lind* (of *Nielsen, Broman & Koch, PLLC*), for petitioner.

*Daniel T. Satterberg, Prosecuting Attorney*, and *Yarden F. Weidenfeld* and *Dennis J. McCurdy, Deputies*, for respondent.

¶1 MADSEN, J. — After he confessed to writing graffiti on the interior of a stolen car, petitioner Leaa'Esola Unga was convicted of vehicle prowling and taking a motor vehicle without permission. He argues that his confession was involuntary and should not have been admitted at trial because it was coerced by a detective's promise that he would not be charged with a crime for the graffiti. The Court of Appeals affirmed the conviction. We affirm the Court of Appeals because Unga's confession was not coerced.

FACTS

¶2 On February 7, 2005, a teacher at an elementary school in the city of SeaTac reported that her car had been stolen from the school parking lot. When Tukwila police recovered the car two days later, the steering column and ignition had been damaged and someone had written on the dashboard in black marker "F[___] Oficer [sic] Gilette [sic] 4rm C-loc, Bear, Bam Bam, Don't trip." Clerk's Papers (CP) at 2.

¶3 On May 26, 2005, King County Sheriff Deputy Timothy Gillette, a SeaTac school resource officer, arrested Unga on an unrelated outstanding warrant. He suspected that Unga or a friend might have written the graffiti on the dashboard of the stolen car based on information he obtained that Unga and his friends were involved in "gang activity that includes graffiti." CP at 2. Gillette asked Sheriff Detective Ryan Mikulcik to speak to Unga about the graffiti in the car and ongoing graffiti threats that had been made against Officer Gillette. Mikulcik had known Unga, who was 16 years old, since Unga was in middle school and had a friendly relationship with him. Mikulcik and Unga met in an interview room. Mikulcik advised Unga of his constitutional rights. After Unga signed a statement that stated he acknowledged these rights and voluntarily waived them, Detective Mikulcik asked Unga about the stolen vehicle. He showed Unga a picture of the graffiti on the dashboard and asked whether he had written it. At first Unga denied having written the graffiti. Mikulcik asked Unga to write Officer Gillette's name to compare handwriting and noted similarities to the writing on the dashboard. Mikulcik asked Unga what "4rm" meant, and Unga responded that "4rm" is the way he writes "from." Verbatim Tr. of Adjudicatory Hr'g (VT) at 41. He asked Unga to write "4rm" and when he did, Mikulcik again noted the writing was similar.

¶4 Detective Mikulcik testified that he told Unga that he "wouldn't charge him with malicious mischief . . . if he

would tell me about another crime" that had to do with graffiti and then clarified that he probably used the word "vandalism" rather than "malicious mischief." VT at 38-39. He testified it was possible that he told Unga he would not be charged "with the graffiti," but added that he normally did not say that. VT at 39. Detective Mikulcik's intention was to find out who was making death threats against Officer Gillette, and he was hoping that Unga would be able tell him. He did not intend to get Unga to confess to motor vehicle theft. Unga testified that he thought that Mikulcik "meant the whole car, the whole charge of the car"—that he would not be charged with any crime in connection with the car. VT at 56. Unga confessed to writing the graffiti on the dashboard and signed the following written confession:

> I was in a Honda Civic that was stolen. I was in the passenger seat and I cannot remember who was driving. I have been in many stolen cars and I know this one was stolen because the ignition was damaged. I used a marker and wrote on the dash board "F[___] Oficer [sic] Gilette [sic] 4rm c-loc, bear bam bam, don't trip." I have not written anything else about Officer Gillette and have never written anything threatening. This is the only thing I have written about him. I hope it wasn't taken as a threat or the wrong way.

State Ex. 2.

¶5 The State charged Unga with one count of taking a motor vehicle without permission in the second degree and one count of vehicle prowl in the second degree. Unga moved to suppress his confession on the ground that he was coerced into confessing by Mikulcik's promise that he would not be charged with a crime. On October 17, 2005, a CrR 3.5 hearing was held. Following the hearing, the juvenile court concluded that "[w]hile Detective Mikulcik's statement that he would not charge the respondent with the graffiti to the dashboard may have been deceptive to some extent, some police deception is permitted by the Washington courts under *State v. Burkins*, 94 Wn. App. 677[, 973 P.2d 15] (1999)." CP at 46. The court held the confession was admissible because Mikulcik's conduct was "not so over-

bearing as to overcome" Unga's "will to resist" and Unga knowingly, intelligently, and voluntarily waived his right to remain silent. *Id.* The adjudicatory hearing immediately followed, and based on the confession and other evidence presented, the court convicted Unga of second degree vehicle prowl and second degree taking a motor vehicle without permission.

¶6 Unga appealed, arguing that the juvenile court erred when it refused to suppress the confession. He also contended that his two convictions violated double jeopardy proscriptions. The Court of Appeals affirmed. *State v. L.U.*, 137 Wn. App. 410, 153 P.3d 894 (2007).

## ANALYSIS

¶7 Unga maintains that his confession was coerced in violation of his right not to incriminate himself. The Fifth Amendment to the United States Constitution states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." Article I, section 9 of the Washington State Constitution states that "[n]o person shall be compelled in any criminal case to give evidence against himself." The protection provided by the state provision is coextensive with that provided by the Fifth Amendment. *State v. Earls*, 116 Wn.2d 364, 374-75, 805 P.2d 211 (1991). Admission of an involuntary confession at trial violates both provisions.

> [T]he determination whether statements obtained during custodial interrogation are admissible against the accused is to be made upon an inquiry into the totality of the circumstances surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to forgo his rights to remain silent and to have the assistance of counsel.

*Fare v. Michael C.*, 442 U.S. 707, 724-25, 99 S. Ct. 2560, 61 L. Ed. 2d 197 (1979); *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973); *Miranda v. Arizona*, 384 U.S. 436, 475-77, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Because the Fifth Amendment protects a person

from being compelled to give evidence against himself or herself, the question whether admission of a confession constituted a violation of the Fifth Amendment does not depend solely on whether the confession was voluntary; rather, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.' " *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986). Thus, both the conduct of law enforcement officers in exerting pressure on the defendant to confess and the defendant's ability to resist the pressure are important. *United States v. Brave Heart*, 397 F.3d 1035, 1040 (8th Cir. 2005).

¶8 Circumstances that are potentially relevant in the totality-of-the-circumstances analysis include the "crucial element of police coercion"; the length of the interrogation; its location; its continuity; the defendant's maturity, education, physical condition, and mental health; and whether the police advised the defendant of the rights to remain silent and to have counsel present during custodial interrogation. *Withrow v. Williams*, 507 U.S. 680, 693-94, 113 S. Ct. 1745, 123 L. Ed. 2d 407 (1993) (and cases cited therein).

¶9 The totality-of-the-circumstances test specifically applies to determine whether a confession was coerced by any express or implied promise or by the exertion of any improper influence. *State v. Broadaway*, 133 Wn.2d 118, 132, 942 P.2d 363 (1997); *Arizona v. Fulminante*, 499 U.S. 279, 285, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991) (abrogating test stated in *Bram v. United States*, 168 U.S. 532, 18 S. Ct. 183, 42 L. Ed. 568 (1897)). A promise made by law enforcement does not render a confession involuntary per se, but is instead one factor to be considered in deciding whether a confession was voluntary. *Fulminante*, 499 U.S. at 285; *Broadaway*, 133 Wn.2d at 132; *United States v. LeBrun*, 363 F.3d 715, 725 (8th Cir. 2004); *United States v. Dowell*, 430 F.3d 1100, 1108 (10th Cir. 2005).

¶10 Whether any promise has been made must be determined and, if one was made, the court must then apply the totality-of-the-circumstances test and determine whether.

the defendant's will was overborne by the promise, i.e., there must be a direct causal relationship between the promise and the confession. *Broadaway*, 133 Wn.2d at 132; *see State v. Rupe*, 101 Wn.2d 664, 678-79, 683 P.2d 571 (1984); *United States v. Walton*, 10 F.3d 1024, 1029 (3d Cir. 1993) ("the real issue is not whether a promise was made, but whether there was a causal connection between [the promise] and [the defendant's] statement").

¶11 This causal connection is not merely "but for" causation; the court does "not ask whether the confession would have been made in the absence of the interrogation." *Miller v. Fenton*, 796 F.2d 598, 604 (3d Cir. 1986); *see Fulminante*, 499 U.S. at 285. "If the test was whether a statement would have been made but for the law enforcement conduct, virtually no statement would be deemed voluntary because few people give incriminating statements in the absence of some kind of official action." *United States v. Guerrero*, 847 F.2d 1363, 1366 n.1 (9th Cir. 1988).

¶12 A police officer's psychological ploys, such as playing on the suspect's sympathies, saying that honesty is the best policy for a person hoping for leniency, or telling the suspect that he could help himself by cooperating may play a part in a suspect's decision to confess, "but so long as that decision is a product of the suspect's own balancing of competing considerations, the confession is voluntary." *Miller*, 796 F.2d at 605; *accord United States v. Miller*, 984 F.2d 1028, 1031 (9th Cir. 1993); *United States v. Durham*, 741 F. Supp. 498, 504 (D. Del. 1990); *State v. Darby*, 1996 SD 127, 556 N.W.2d 311, 320; *State v. Bacon*, 163 Vt. 279, 294-95, 658 A.2d 54 (1995). "The question [is] whether [the interrogating officer's] statements were so manipulative or coercive that they deprived [the suspect] of his ability to make an unconstrained, autonomous decision to confess." *Miller*, 796 F.2d at 605; *see United States v. Baldwin*, 60 F.3d 363, 365 (7th Cir. 1995) ("the proper test is whether the interrogator resorted to tactics that in the circumstances prevented the suspect from making a rational decision whether to confess or otherwise inculpate himself"), *vacated on other grounds*,

517 U.S. 1231, 116 S. Ct. 1873, 135 L. Ed. 2d 169 (1996), *adhered to on remand*, 124 F.3d 205 (7th Cir. 1997).

¶13 The totality-of-the-circumstances analysis also specifically applies in deciding the admissibility of a juvenile defendant's confession. *Fare*, 442 U.S. at 725. Included in the circumstances to be considered are the individual's age, experience, intelligence, education, and background; whether he or she has the capacity to understand any warnings given and his or her Fifth Amendment rights; and the consequences of waiving these rights. *Id.* State courts have a responsibility to examine confessions of a juvenile with special care. *In re Gault*, 387 U.S. 1, 45, 87 S. Ct. 1428, 18 L. Ed. 2d 527 (1967); *Haley v. Ohio*, 332 U.S. 596, 599, 68 S. Ct. 302, 92 L. Ed. 224 (1948); *Simmons v. Bowersox*, 235 F.3d 1124, 1133 (8th Cir. 2001).

¶14 Unga maintains that Detective Mikulcik promised him that he would not be charged with any offense in relation to the car. Mikulcik testified, however, that he promised that he would not charge Unga with any offense relating to vandalism of the car, i.e., the graffiti. The trial court found Mikulcik's testimony more credible because it accepted his version of events. The court found that "[w]hen Detective Mikulcik told the respondent he would not be charged with the graffiti to the dashboard, the respondent admitted to doing it." CP at 45; *see also* VT at 83-84 (court's oral ruling relating to credibility; stating that "[h]aving observed both the officer and the respondent, I don't believe that the conduct of the officer was over-bearing" or that Unga's "will to resist" was overborne). Unga has not assigned error to the trial court's findings, and thus this finding is a verity on review. *Broadaway*, 133 Wn.2d at 131. Therefore, the promise at issue is limited to the graffiti.

¶15 Unga argues Mikulcik's promise was an "offer of immunity" that induced his confession. Unga argued to the Court of Appeals that if a defendant's testimony is induced by a government promise of immunity, it is involuntary and must be suppressed. He argued to that court, and repeats in briefing to this court, that it is questionable whether the

State was even entitled to bring charges against him, given this "offer of immunity." He has cited *United States v. Brimberry*, 744 F.2d 580, 587 (7th Cir. 1984), for the proposition that dismissal of an indictment is required if the prosecution of a defendant was based on direct or indirect testimony taken after a specific promise of immunity. Unga also argued to the Court of Appeals that even if there was no formal grant of immunity, a confession is involuntary if the defendant reasonably perceived that he was providing testimony under a grant of immunity. *See United States v. Cahill*, 920 F.2d 421, 427 (7th Cir. 1990).

¶16 The Court of Appeals concluded that under the totality of the circumstances, Unga mistakenly believed that he would not be charged with any crimes relating to the car, that this mistaken belief was not reasonable, and that Unga's confession was voluntary. *L.U.*, 137 Wn. App. at 415.

¶17 Initially, there was no "offer of immunity." A police officer cannot actually extend immunity from prosecution. Rather, to compel a witness to give up the Fifth Amendment privilege against self-incrimination and testify, a *prosecutor* can offer a defendant immunity from prosecution. *See generally State v. Bryant*, 146 Wn.2d 90, 42 P.3d 1278 (2002) (concerning whether immunity granted by prosecutor of one county binds a different county's prosecutor); *see State v. Bryant*, 97 Wn. App. 479, 484, 983 P.2d 1181 (1999) (to compel an individual to give up his Fifth Amendment privilege against self-incrimination, a prosecutor can offer a defendant immunity from prosecution), *review denied*, 140 Wn.2d 1026 (2000); *State v. Reed*, 75 Wn. App. 742, 745, 879 P.2d 1000 (1994) (the police do not have authority to make prosecutorial decisions, and the decision whether to file criminal charges is within the prosecutor's discretion).[1]

¶18 Next we consider the question addressed by the Court of Appeals, i.e., whether Unga reasonably per-

---

[1] However, a promise made but not kept might implicate concerns of due process, not an issue here. *See generally Bryant*, 146 Wn.2d at 104-05.

ceived that an offer of immunity had been made and, if so, whether his confession was therefore involuntary. As Unga argued, *Cahill*, 920 F.2d at 427, does state that a defendant's perception that he is testifying under a grant of immunity does not make the testimony involuntary unless his perception is reasonable. However, even assuming Unga had such a reasonable belief, it is not true that a defendant's reasonable perception of immunity alone renders his confession involuntary, as the First Circuit has explained.[2] In *United States v. Flemmi*, 225 F.3d 78 (1st Cir. 2000), the district court had relied on *Cahill* and reasoned that the defendant's confession was involuntary because he reasonably perceived he had been granted immunity from prosecution. The First Circuit observed that it may have been true at one time that an unauthorized promise of immunity inducing a statement might have rendered the statement inadmissible, but the United States Supreme Court has since held that statements must be excluded as involuntary only when they are procured by coercive, official tactics. *Id.* at 91; *see Connelly*, 479 U.S. at 167. And "[t]he mere fact that an unfulfilled promise was made in exchange for a person's statement does not constitute coercion, rendering the statement involuntary." *Flemmi*, 225 F.3d at 91. Such a promise, like any other promise of leniency, is only one factor in the totality of the circumstances analysis and it must be considered in the context of all of the circumstances. *Id.* at 92; *Fulminante*, 499 U.S. at 285; *Broadaway*, 133 Wn.2d at 132; *LeBrun*, 363 F.3d at 725; *Dowell*, 430 F.3d at 1108.

¶19 The court's analysis in *Flemmi* follows United States Supreme Court precedent: a totality-of-the-circumstances analysis must be applied, under which the promise is one of the circumstances in determining whether a defendant's will has been overborne.

---

[2] The only finding made by the trial court was that Detective Mikulcik "told the respondent he would not be charged with the graffiti to the dashboard," CP at 45, not that a promise of immunity was made to Unga or that Unga had a reasonable but mistaken belief that he had been offered immunity.

¶20 The concurrence is thus incorrect when it gives conclusive weight to the fact that a promise was made. The concurrence deems Detective Mikulcik's promise to be "coercive," saying that "[t]he circumstances of Unga's age, education, or prior relationship with Detective Mikulcik cannot change [this] simple fact." Concurrence at 119. But *Fulminante* directs that a promise made by a law enforcement officer is only one factor to consider in deciding whether a confession is voluntary. Thus, although the concurrence gives lip service to the totality-of-the-circumstances test, it does not actually follow the *Fulminante* analysis.

¶21 The concurrence also cites *Lynumn v. Illinois*, 372 U.S. 528, 83 S. Ct. 917, 9 L. Ed. 2d 922 (1963), for the proposition that an interrogator's use of physical or psychological pressure to obtain a confession will not be excused, and reasons that such pressure renders the confession involuntary as a matter of law. Concurrence at 119. *Lynumn* does not support the proposition. The United States Supreme Court in fact applied a totality-of-the-circumstances approach and determined the defendant's confession was involuntary. The police had told the defendant, a widow, that her children, ages three and four, would be taken from her and put in foster homes and state financial aid would be cut off. These "threats were made while she was encircled in her apartment by three police officers and a twice convicted felon who had purportedly 'set her up.'" *Lynumn*, 372 U.S. at 534. The Court noted that the defendant "had no previous experience with the criminal law, and had no reason not to believe that the police had ample power to carry out their threats." *Id.* The state of Illinois conceded, and the Court held, that under the totality of the circumstances, the defendant's confession was coerced. *Id.* at 534-35.

¶22 The concurrence cites no relevant authority supporting the view that if a police officer makes a promise that charges will be dropped, the court essentially does not need

to look any further to determine whether a confession is voluntary.[3]

¶23 Before turning to the totality of the circumstances in this case, we note that Unga also maintains that fundamental fairness requires the government to scrupulously perform its end of the bargain, citing *Bryant*, 146 Wn.2d at 105, and here the government "[a]rguably" did not do so. Suppl. Br. of Pet'r at 14. The State says Mikulcik referred the case to the prosecutor only as a motor vehicle case, thereby keeping his promise, and the prosecutor later made the independent decision within his discretion to charge Unga with vehicle prowling. In addition, during oral argument the State said it would dismiss the vehicle prowl count, which was founded on Unga's having entered the car with the intent to commit a crime against property therein, i.e., the graffiti. *See* RCW 9A.52.100. The State made this concession in light of Detective Mikulcik's promise that Unga would not be charged with the graffiti. We accept the State's concession and direct that the charge of vehicle prowl in the second degree be dismissed.

¶24 We turn now to the issue whether, under a totality-of-the-circumstances analysis, the promise by Detective Mikulcik coerced Unga into making an involuntary confession. The circumstances at the time of the confession determine whether it was voluntary. *United States v. Charles*, 476 F.3d 492, 498 (7th Cir. 2007).

¶25 Unga contends that the evidence shows the promise induced his confession because although he had denied writing the graffiti, once Detective Mikulcik said that he would not be charged for the vandalism, he confessed. He emphasizes his young age and the friendly relationship he had with Mikulcik.

---

[3] The concurrence repeatedly uses the term "immunity." If meant as a term of art, it has no place in this case, as explained. If its intended meaning is that charges will be dropped, there is nothing about the term that justifies any approach other than the totality-of-the-circumstances approach demanded by United States Supreme Court precedent.

¶26 An unqualified promise not to prosecute that in fact induces a confession may be "of such a nature that it can easily be found to have overcome a person's resistance to giving a statement to authorities." *United States v. Conley*, 859 F. Supp. 830, 836 (W.D. Pa. 1994). However, as explained, a promise does not per se render a confession involuntary; it is one factor among the totality of the circumstances. "That a law enforcement officer promises something to a person suspected of a crime in exchange for the person's speaking about the crime does not automatically render inadmissible any statement obtained as a result of that promise." *Walton*, 10 F.3d at 1028. "The promise must be sufficiently compelling to overbear the suspect's will in light of all attendant circumstances." *Guerrero*, 847 F.2d at 1366. After *Fulminante*, the key is whether the promise made it impossible for the defendant to make a rational choice as to whether to confess. *Baldwin*, 60 F.3d at 365.

¶27 Unga was given *Miranda*[4] warnings and knew what his rights were. He acknowledged and waived these rights. There is no evidence that he lacked the capacity to understand his rights or the consequences of waiving his rights. He was 16½ years old. In *Fare*, the Court held that a 16-year-old can make a statement intelligently and voluntarily, without a friendly adult present. *Fare*, 442 U.S. 707. Although Unga was a minor, many defendants of a similar age or younger have been found to have voluntarily confessed. *See, e.g., Gachot v. Stalder*, 298 F.3d 414 (5th Cir. 2002); *Simmons*, 235 F.3d 1124 (17 years old); *Gilbert v. Merchant*, 488 F.3d 780 (7th Cir. 2007) (14 years old); *Hardaway v. Young*, 302 F.3d 757, 762-68 (7th Cir. 2002) (14 years old); *Winfrey v. Wyrick*, 836 F.2d 406, 410 (8th Cir. 1987) (17 years old and of "subnormal intelligence"). In contrast, where an 11-year-old suspect who was inexperienced with the police made inculpatory statements, the court found counsel was ineffective for failing to challenge

---

[4] *Miranda*, 384 U.S. 436.

the admissibility of the statements. *A.M. v. Butler*, 360 F.3d 787, 800-02 (7th Cir. 2004). Unga had completed the ninth grade.

¶28 There is evidence that Unga was a gang member. *See Ruvalcaba v. Chandler*, 416 F.3d 555, 561 (7th Cir. 2005) (although defendant had no prior experience with the criminal justice system, he was a " 'streetwise' " gang member, which reduced the importance of his lack of such experience and indicated the capacity to appreciate his rights). Unga was clearly aware that he was being questioned as a suspect in the commission of criminal activity.

¶29 The questioning was of short duration, lasting only 30 minutes. Unga was questioned in a small room containing a table and two chairs, where the door was left open. The interviewing officer was not in uniform and did not wear a firearm. There is no evidence that Mikulcik used a threatening tone, raised his voice, badgered Unga, attempted to intimidate him, or engaged in other similar tactics. Unga was not subjected to lengthy, prolonged questioning, nor to repeated rounds of questioning. There is no evidence that he was deprived of any necessities such as food, sleep, or bathroom facilities. In *LeBrun*, 363 F.3d at 726, the court found the defendant's confession was voluntary, noting among other things that it placed "substantial weight on the fact that [the defendant] confessed after a mere thirty-three minutes" and the situation was not one where officers wore down the defendant's will with persistent questioning over a considerable length of time. *Cf. Haley*, 332 U.S. 596 (confession involuntary where 15-year-old was arrested at midnight, held incommunicado, subjected to continuous interrogation by a rotation of police officers until he confessed after having been shown alleged confessions of two others involved in the robbery, not informed of right to counsel, and, when his mother brought fresh clothing for him, she found his old clothing was torn and bloody).

¶30 Unga testified that because he had known Mikulcik since middle school, he thought that Mikulcik "was going to

be okay with it," i.e., would "drop all the charges." VT at 54-55. Mikulcik and Unga had a friendly relationship that began a few years earlier. In some instances a friendly relationship might tend to indicate coercion if it is employed to cause the suspect to relax and confide in the officer. For example, in *Walton*, 10 F.3d 1024, Walton had been named as the source of illegally sold firearms and, because he had been implicated, was subjected to a regulatory inspection as a federal firearms licensee. The agents did not advise him that he was suspected of being the source of the illegally sold firearms. *Id.* at 1027. Walton told the agents he had no records for them to inspect. *Id.* The following day, he called one of the agents because he had known him in high school, and asked to meet at an open area outside the local library and talk off the record. *Id.* The next day, that agent and another met Walton on a park bench, and the first agent told Walton, " 'I've known you for a long time. If you want, you can tell us what happened off the cuff.' " *Id.* Walton admitted providing the firearms. He told the agent that he did not know what to do and wanted the agent to help him because he was his friend. He was later charged with conspiring to sell firearms illegally.

¶31 The court held that Walton's statement was involuntary, in light of the following circumstances: Walton believed the statement that the conversation would be off the cuff meant that his statements would not be used against him, as did both agents present; the agent he knew made reference to his prior relationship with Walton as a basis for inviting him to speak "off the cuff" and the purpose of this reference was clearly to provide assurance that he could confide in the agents and anything he told them would not be used against him; the setting on a park bench did not detract from the friendly assurance, unlike an environment more typically associated with a police interrogation; and Walton had no reason to believe he was the subject of a criminal investigation. *Id.* at 1030.

¶32 Here, however, there is no indication that Detective Mikulcik exploited the friendly nature of the relationship to

overcome Unga's will and the evidence indicates that Unga was well aware that the encounter was not a friendly chat. He had been kept in a cell prior to the questioning, had been given *Miranda* warnings by Detective Mikulcik, and was being questioned about serious criminal activity—threats against a police officer—in an interrogation room where the police were stationed in the city hall.

¶33 Under all of these circumstances, we do not agree that Mikulcik's promise was coercive conduct that overbore Unga's will and caused him to confess. This case is unlike other cases where confessions have been found to be involuntary. For example, in *Taylor v. Maddox*, 366 F.3d 992 (9th Cir. 2004), a 16-year-old was awakened in the middle of the night by four men with guns drawn and flashlights trained around the room. He was handcuffed, driven to the police station, taken to a small interrogation room, and left alone for 30 minutes. He was subjected to a three-hour interrogation that began after midnight and included threats from one of the officers. He was given no food and offered no rest break. The court held that the defendant's confession was involuntary because he was interrogated for roughly three hours in the middle of the night, was relatively young, had been given no food, had been offered no rest break, and was threatened by one of the officers. *Id.* at 1015-16. In *In re Interest of Jerrell C.J.*, 2005 WI 105, 283 Wis. 2d 145, 699 N.W.2d 110, a 14-year-old, with a low standard range of intelligence and previous school records showing average to failing grades with a more recent 3.6 grade point average, was handcuffed to a wall and left alone for approximately two hours and then interrogated for five and one-half hours before signing a confession. He was denied his request to call his parents. He had been arrested twice before for misdemeanors, confessed his involvement, and was allowed to go home. Here he was arrested for armed robbery. The officers refused to believe his repeated denials of guilt, joined in urging him to tell a different "truth," and sometimes used a "strong voice" that frightened him. The court held his confession was involuntary. In *A.M.*, 360 F.3d 787, an

11-year-old had no prior experience with the criminal justice system and was questioned for almost two hours in a closed interrogation room with no friendly adult, and the questioning detective continually challenged his statement and accused him of lying. The court held that the defendant's statements should have been suppressed and, at the least, counsel was ineffective for failing to challenge the statements on voluntariness grounds. *Id.* at 801.

¶34 The circumstances in all of these cases are qualitatively unlike the circumstances in Unga's case. The trial court correctly concluded that Unga's confession was not coerced, and instead he voluntarily waived his rights to remain silent and not to incriminate himself.

¶35 The concurrence maintains, however, that even if the surrounding circumstances are considered, "the surrounding circumstances do not excuse the coercive aspect of Detective Mikulcik's unequivocal promise of immunity." Concurrence at 119.[5] As this statement reflects, the concurrence misstates the constitutional inquiry, which is whether in light of the totality of the circumstances, the defendant's will was overborne. Instead, the concurrence appears to believe that a promise to drop charges is presumptively coercive, if not conclusively so, and must be "excused" by the circumstances.

¶36 In addition, the concurrence cites absolutely no authority that supports its conclusion that Unga's confession was voluntary with regard to one charged offense but involuntary with respect to another. This conclusion appears to be part and parcel of the concurrence's theory that a promise to drop charges is, either as a matter of law or as a presumption that must be overcome by the circumstances, unconstitutionally coercive—and hence the difference. But the theory is, at its core, simply a reprise of the former rule stated in *Bram*, 168 U.S. at 542-43, that a confession cannot be obtained by "any direct or implied

---

[5] As noted, there is no formal offer of immunity in question.

promises." The problem for the concurrence is that the rule in *Bram* was jettisoned in *Fulminante*.

¶37 Given the lack of authority for splitting a confession to multiple charges, and given that this artificial division appears rooted in an abrogated rule, the concurrence's conclusion that Unga's confession was voluntary as to the stolen vehicle charge but involuntary as to vehicle prowling is untenable.

¶38 Finally, in light of our acceptance of the State's concession and request that the charge of second degree vehicle prowling be dismissed, we do not reach Unga's argument that the conviction for vehicle prowling should be reversed on double jeopardy grounds.

## CONCLUSION

¶39 The fact that a promise has been made not to charge a defendant with vandalism if the defendant tells about another crime does not alone render a subsequent confession involuntary. Instead, the totality of the circumstances must be examined to determine whether the confession was involuntary. In this case, under the totality of the circumstances the confession was voluntary. Accordingly, we affirm the trial court and the Court of Appeals.

ALEXANDER, C.J., and C. JOHNSON, OWENS, FAIRHURST, J.M. JOHNSON, and STEPHENS, JJ., concur.

¶40 SANDERS, J. (concurring)—Leaa'Esola Unga was convicted of second degree taking a motor vehicle without permission[6] and second degree vehicle prowling[7] based solely on his confession: "I was in a Honda Civic that was

---

[6] "A person is guilty of taking a motor vehicle without permission in the second degree if he or she . . . voluntarily rides in or upon the automobile or motor vehicle with knowledge of the fact that the automobile or motor vehicle was unlawfully taken." RCW 9A.56.075(1).

[7] "A person is guilty of vehicle prowling in the second degree if, with intent to commit a crime against a person or property therein, he enters or remains unlawfully in a vehicle . . . ." RCW 9A.52.100(1).

stolen. . . . I know this one was stolen . . . . I used a marker and wrote on the dash board . . . ." Clerk's Papers at 45. Unga confessed after Detective Mikulcik made an unequivocal, yet limited, promise of immunity from prosecution for the graffiti.

¶41 While I agree with the majority that the State's dismissal of the vehicle prowl charge controls the outcome of this case, *see* majority at 107, 113, I write separately to state my concern with the majority's analysis of the circumstances of Unga's confession. The only issue remaining after the State's concession is whether Unga voluntarily confessed to being in a car knowing it was stolen. I believe he did because the promise of immunity related to the graffiti was unrelated to being in a car knowing it was stolen. However, I would be remiss if I did not comment on the majority's analysis of both aspects of Unga's confession.

¶42 An unequivocal promise of immunity made to induce a confession, which in fact induces the confession, renders the confession to the immunized conduct inadmissible. *See* 12 ROYCE A. FERGUSON, JR., WASHINGTON PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 3319, at 877-78 (3d ed. 2004) ("The confession of one accused of a crime which is induced or influenced by promises made to the accused which hold out a hope of benefit or reward is not a voluntary confession and therefore inadmissible in evidence. . . . An offer or promise of leniency vitiates an accused's subsequent confession only if it constitutes an inducement which motivated the defendant to confess.").

¶43 The Fifth Amendment to the United States Constitution states, "No person shall be . . . compelled in any criminal case to be a witness against himself . . . ." Similarly, article I, section 9 of our state constitution provides, "No person shall be compelled in any criminal case to give evidence against himself . . . ." To "compel" means "[t]o employ force or constrain; to exert an irresist-

ible influence."[8] The clear language of the United States and Washington State Constitutions focuses our inquiry on the interrogator's tactic and the pressure created by the tactic.[9]

¶44 While pressure is generally thought of as positive or external, there are many situations where a negative or internal pressure is applied by an interrogator. The court must inquire into the interrogator's use of any pressure and whether such pressure prevents the suspect from making a rational decision. *Accord* majority at 108 (citing *United States v. Baldwin*, 60 F.3d 363, 365 (7th Cir. 1995), *vacated on other grounds*, 517 U.S. 1231, 116 S. Ct. 1873, 135 L. Ed. 2d 169 (1996), *adhered to on remand*, 124 F.3d 205 (7th Cir. 1997)).

¶45 Some tactics exert the clearly prohibited external or positive pressure, such as the truncheon to the head. *See, e.g., Brown v. Mississippi*, 297 U.S. 278, 56 S. Ct. 461, 80 L. Ed. 682 (1936) (reversing conviction based on confession obtained by physical coercion). Other tactics exert an equally prohibited internal or negative pressure to remove the rationale of resistance.[10] An interrogator employing either form of pressure, to exert an irresistible influence, coerces the confession by preventing the suspect from making a rational decision.

¶46 In context, when an interrogator asks a question of a suspect, that act of questioning does not in itself compel a

---

[8] WEBSTER'S NEW INTERNATIONAL DICTIONARY 544 (2d ed. 1934); *see also* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 463 (2002) (defining "compel" as "to employ force; . . . to exert an irresistible influence").

[9] "Appropriate constitutional analysis begins with the text and, for most purposes, should end there as well." *Malyon v. Pierce County*, 131 Wn.2d 779, 799, 935 P.2d 1272 (1997).

[10] We must disabuse ourselves of the notion that an innocent person would not confess to a crime he or she did not commit. *See generally* Richard A. Leo et al., *Bringing Reliability Back In: False Confessions and Legal Safeguards in the Twenty-First Century*, 2006 WIS. L. REV. 479, 514-16 (2006) (citing numerous studies on false confessions); Mark A. Godsey, *Reliability Lost, False Confessions Discovered*, 10 CHAP. L. REV. 623, 628 (2007) (noting the "pervasive" problem of false confessions); *see also* 12 FERGUSON, *supra*, § 3316, at 871 ("Involuntary confessions are inadmissible because persons influenced by hope of benefit . . . may confess to alleged crimes which they did not in fact commit.").

confession; the suspect has a right not to answer, so no force is being applied. Importantly, the suspect's circumstances have not changed relative to the moment before the question was asked. *See State v. Burkins*, 94 Wn. App. 677, 695-96, 973 P.2d 15 (1999) ("Courts have held confessions to be voluntary when police falsely told a suspect that his polygraph examination showed gross deceptive patterns, when police told a suspect that a co-suspect named him as the triggerman, and when police concealed the fact that the victim had died."); *State v. Trout*, 125 Wn. App. 403, 105 P.3d 69 (2005) (holding a confession to have been made voluntarily despite a statement by the police that whoever confessed first would receive preferential treatment).

¶47 If, however, the interrogator withholds food or water to provoke a confession, such a tactic compels the confession; the suspect has the same right not to answer, but the suspect's circumstances have changed relative to the moment before the food or water was withheld. The interrogator coerced the confession by imposing an irresistible influence over the suspect through the choice of confession or starvation.

¶48 The same is true of an unequivocal promise of immunity made to induce a confession, which in fact induces the confession. A promise of immunity coerces a confession because of the internal pressure placed upon the suspect. Again, the suspect has the same right not to answer, but the suspect's circumstances have changed relative to the moment before the unequivocal promise of immunity was made. The suspect must now make an irresistible choice: accept the promise of immunity and confess, or reject the promised immunity, remain silent, and suffer the consequences. The Fifth Amendment and article I, section 9 guarantee "the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence." *Malloy v. Hogan*, 378 U.S. 1, 8, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964).

¶49 Courts consistently recognize the coercive aspect of confessions obtained by an interrogator's promise of immunity. *See State v. Arrowood*, 375 S.C. 359, 367, 652 S.E.2d 438 (2007) ("A statement 'may not be extracted by any sort of threats or violence, [or] obtained by any direct or implied promises . . . .' " (first alteration in original) (quoting *State v. Rochester*, 301 S.C. 196, 200, 391 S.E.2d 244 (1990))); *State v. Middleton*, 220 W. Va. 89, 101, 640 S.E.2d 152 (2006) ("Ultimately, this issue boils down to whether or not the incriminating statement 'was freely and voluntarily made, without . . . some promise or benefit held out to the accused.' " (quoting *State v. Singleton*, 218 W. Va. 180, 184, 624 S.E.2d 527 (2005))); *State v. Ellison*, 213 Ariz. 116, 127, 140 P.3d 899 (" 'Promises of benefits or leniency, whether direct or implied, even if only slight in value, are impermissibly coercive.' " (quoting *State v. Lopez*, 174 Ariz. 131, 138, 847 P.2d 1078 (1992))), *cert. denied*, 549 U.S. 1000 (2006); *People v. Coffman*, 34 Cal. 4th 1, 55, 96 P.3d 30, 17 Cal. Rptr. 3d 710 (2004) (" 'A statement is involuntary . . . when, among other circumstances, it was . . . obtained by any direct or implied promises, however slight.' " (internal quotation marks omitted) (quoting *People v. Neal*, 31 Cal. 4th 63, 79, 72 P.3d 280, 1 Cal. Rptr. 3d 650 (2003))); *United States v. Crawford*, 372 F.3d 1048, 1060-61 (9th Cir. 2004) (" 'Trickery, deceit, even impersonation do not render a confession inadmissible . . . unless government agents make threats or promises.' " (quoting *United States v. Kontny*, 238 F.3d 815, 817 (7th Cir. 2001))); *People v. Gilliam*, 172 Ill. 2d 484, 500, 670 N.E.2d 606, 218 Ill. Dec. 884 (1996) ("[T]he test of voluntariness is whether the defendant made the statement . . . without compulsion or inducement of any sort . . . ."); *Muniz v. State*, 851 S.W.2d 238, 254 (Tex. Crim. App. 1993) ("Before a promise will render a confession inadmissible, it must be shown that the promise induced the confession."); *State v. Allen*, 839 P.2d 291, 300 (Utah 1992) ("The ultimate inquiry is . . . whether . . . improper threats or promises prompted the accused to talk when he otherwise would not have done so."); *Ponticelli v. State*, 593 So. 2d 483, 488 (Fla. 1991) ("A promise of immunity,

calculated to extract a confession or incriminatory statement, renders the statement involuntary."), *vacated on other grounds*, 506 U.S. 802, 113 S. Ct. 32, 121 L. Ed. 2d 5 (1992), *adhered to on remand*, 618 So. 2d 154 (1993).

¶50 The majority attempts to evade the impact of Detective Mikulcik's interrogation tactic by stating, "[a] police officer cannot actually extend immunity from prosecution. Rather, to compel a witness to give up the Fifth Amendment privilege against self-incrimination and testify, a *prosecutor* can offer a defendant immunity from prosecution." Majority at 104. Be that as it may, it is highly unlikely a criminal suspect undergoing interrogation, much less a boy with only a ninth grade education, is aware of the nuanced relationship between his interrogators and his prosecutors. Moreover, that Detective Mikulcik falsely promised immunity serves only to highlight the coercive aspect of Detective Mikulcik's interrogation tactic.

> An offshoot of the rule against coerced confessions prohibits the use of confessions obtained by false promises, which are looked upon as a type of coercion which overcomes by unacceptable means the will of the person being questioned. It proscribes false promises of immunity or of leniency offered as a material benefit in return for a confession.

*People v. Andersen*, 101 Cal. App. 3d 563, 575, 161 Cal. Rptr. 707 (1980).

¶51 Nor is this a new approach to analysis of a suspect's confession. *See State v. Broadaway*, 133 Wn.2d 118, 132, 942 P.2d 263 (1997) (establishing the "totality of the circumstances" and stating, "[t]he court must determine whether there is a causal relationship between the promise and the confession"). Under the "totality of the circumstances," the court analyzes the police conduct along with the characteristics unique to the suspect, such as the suspect's age, physical condition, and mental condition, the duration of the interrogation, and the environment of the interrogation to determine if the suspect's confession was coerced. *See id.*; *Arizona v. Fulminante*, 499 U.S. 279, 285, 111 S. Ct. 1246,

113 L. Ed. 2d 302 (1991). "In assessing the totality of the circumstances, a court must consider any promises or misrepresentations made by the interrogating officers." *Broadaway*, 133 Wn.2d at 132; *see Fulminante*, 499 U.S. at 288. "The inquiry is whether the Defendant's will was overborne." *Broadaway*, 133 Wn.2d at 132.

¶52 In other words, no matter how mature, intelligent, or comfortable a suspect is during the interrogation, the interrogator's use of physical or psychological pressure to obtain a confession will not be excused. *See, e.g., Lynumn v. Illinois*, 372 U.S. 528, 83 S. Ct. 917, 9 L. Ed. 2d 922 (1963) (holding a confession to be involuntary when the police told defendant her children would be placed in foster homes and her welfare taken away if she did not cooperate).

¶53 Applying our established analysis here, Unga's confession contains two distinct components: writing the graffiti and riding in the car knowing it was stolen.[11] The trial court should have suppressed the former for being the direct result of an unequivocal promise of immunity, but not necessarily the latter.

¶54 Detective Mikulcik compelled Unga's confession to the graffiti by unequivocally promising immunity to induce Unga to confess to the graffiti, which in fact induced Unga to confess to the graffiti. The circumstances of Unga's age, education, or prior relationship with Detective Mikulcik cannot change the simple fact Detective Mikulcik unequivocally promised immunity to Unga to compel Unga to confess.

¶55 Moreover, the surrounding circumstances do not excuse the coercive aspect of Detective Mikulcik's unequivocal promise of immunity. Unga was 16 years old with a ninth grade education. He was arrested and placed in a holding cell for an unknown period of time and then taken to a four-foot-by-four-foot room by Detective Mikulcik, a

---

[11] The majority asserts looking at Unga's confession as two distinct components is "rooted in an abrogated rule" but fails to show *Fulminante* requires otherwise. Majority at 113; *see Fulminante*, 499 U.S. 279.

person Unga knew since middle school. Detective Mikulcik, unarmed and in plain clothes, read Unga his rights, including a juvenile warning, and Unga signed an acknowledgement of his rights. Detective Mikulcik proceeded to question Unga in a friendly manner, first about graffiti, but then about threats made to another officer. At first Unga denied the graffiti, but after Detective Mikulcik unequivocally promised Unga he would not be charged with the graffiti because he was more interested in the threats to another officer, Unga confessed to writing the graffiti. Unga's confession was a direct result of Detective Mikulcik's promised immunity. *See Broadaway*, 133 Wn.2d at 132 (stating, "[t]he court must determine whether there is a causal relationship between the promise and the confession").

¶56 As to the second component of Unga's confession, the record contains substantial evidence supporting the trial court's determination of voluntariness.[12] Detective Mikulcik testified he and Unga did not talk about the car theft, but about graffiti and threats to Officer Gillette. Unga testified he thought Detective Mikulcik's promise of immunity applied to all the charges relating to the car, yet when asked in what context the car was discussed, Unga could not remember. When asked about the offer of immunity, Unga testified, "[Detective Mikulcik] said, If you say—if you admit saying that you did this, then you would—what do you call it—you won't get charged with the graffiti." Verbatim Report of Proceedings (Oct. 17, 2005) at 54. When asked whether Detective Mikulcik told him he was investigating a stolen car, Unga testified, "He said—he just asked me about this car, and then he just asked me about some other graffitis [sic] and (inaudible) I don't know." *Id.* at 57. Lastly, when asked if Detective Mikulcik ever told him the car containing the graffiti was stolen, Unga could not remem-

---

[12] " '[S]ubstantial evidence' is defined as that character of evidence which would convince an unprejudiced thinking mind of the truth of the fact to which the evidence is directed." *State v. Davis*, 73 Wn.2d 271, 283, 438 P.2d 185 (1968) (citing *Bland v. Mentor*, 63 Wn.2d 150, 385 P.2d 727 (1963)).

ber. *Id.* At the end of the interrogation, Unga signed a statement confessing to being in a car knowing it was stolen.

¶57 Nothing suggests Unga's "will was overborne," forcing his confession to being in a car knowing it was stolen. *Broadaway*, 133 Wn.2d at 132. Unga presented no evidence of mental or physical deficiency for his age, nor does he argue his physical condition, age, or mental abilities undermined his ability to comprehend what Detective Mikulcik promised or the confession he was signing. Under these circumstances, the record contains substantial evidence supporting the conclusion that Unga voluntarily confessed to knowingly riding in a stolen car.

¶58 To conclude, Unga's confession to the graffiti was coerced by Detective Mikulcik's unequivocally promising immunity from prosecution for the graffiti. However, Detective Mikulcik's unequivocal promise of immunity was limited only to the graffiti, so Unga's confession to riding in a car knowing it was stolen was not coerced by the promise, and the circumstances of Unga's confession support the conclusion that Unga voluntarily confessed to riding in a car knowing it was stolen.

¶59 The majority reasons otherwise so I write separately to concur in result only.

CHAMBERS, J., concurs with SANDERS, J.