IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 32827-9-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID PRESTON WOOD, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

KORSMO, J. — David Wood (DW) appeals from a juvenile court decision adjudicating him guilty on two counts of second degree assault, contending that his confession to a detective was not voluntary. Finding no error, we affirm.

FACTS

Mr. Wood, 17, and his girlfriend, JL, 16, were the parents of two month old PL. On June 2, 2014, PL had what appeared to be a seizure and was taken to Kadlec Hospital. Authorities there eventually alerted police that the injured child, who suffered from multiple skull fractures, was not an accident victim.

Mr. Wood accompanied his son to the hospital and stayed the night until the next day when he had to leave to work a shift at the Subway sandwich shop, a position he had held for two weeks. Mr. Wood had a ninth grade education. He returned to the hospital

about 9:00 p.m. A police officer was waiting to speak about the child's injuries. Mr. Wood first consulted with the child's doctor and learned that PL had injured legs and head trauma. The officer knocked on the door and asked if Mr. Wood was willing to go to the police station. He agreed and rode in the front seat of a patrol car on the short trip to the station.

When he first arrived at the police station around 9:30 p.m., he was placed in one room, and then around 10:00 moved to an interrogation room. Before he was moved to this second room, he could hear JL crying outside the door. Once in the second room, Detective Robert Benson eventually met him and asked if it their interview could be recorded; Mr. Wood consented. The interview began at 10:45 p.m.[1] Ex. 18[2] at 22:45:12. The contents and conduct of the interview are detailed at some length in view of the issue presented.

Prior to questioning, Detective Benson told Mr. Wood that he was not under arrest, but did read Mr. Wood his *Miranda*[3] rights, including the juvenile rights. Ex. C at 2-3. Mr. Wood indicated that he understood his rights, and that "ya" he did want to talk. Detective Benson stated that if Wood was too tired, or needed water or to go to the

---

[1] The time-stamp appears to be faster than the time stated by the detective's telephone by about eight minutes.

[2] Exhibit 18 is the video, while Exhibit C is the transcript of the video.

[3] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

2

bathroom, to let him know and he would be accommodated. At the outset, Mr. Wood admitted to being tired, and the two joked that if one of them fell asleep during the interview the other should wake up the sleeper.

During the first hour of questioning, the detective asked general questions, trying to get a timeline. Wood described what had happened the previous night with the seizure as well as his and JL's usual routine with the baby. During the first part of this hour, JL was being questioned in the adjacent room. DW later testified that he could hear her crying in the next room. The detective could hear only muffled conversations from the next room, but about 10-20 minutes into the interview he texted the other officer to move JL to a different room away from DW On the recording, the only time crying is audible is around 10:59 pm. Ex. 18 at 22:58:57-22:59:06. Immediately after the crying, Detective Benson pulls out his cell phone and uses it briefly. *Id.* at 22:59:35. After an hour, the detective asked if anything was needed. Mr. Wood requested some water and the detective returned with some seven minutes later.

The detective then left for 45 minutes. Ex. 18 at 23:52:05-00:37:40. Mr. Wood spent some of that time with his head down and his arms crossed, possibly asleep. At one point, the lights shut off and another officer came in to explain that he needs to move to turn them back on. Ex. C at 17. When the officer entered the room, DW stood up and gathered his stuff as if to leave. However, the officer told Mr. Wood that he is "almost

3

done" and asks him to "just hang tight." *Id.* When asked, "do I stay here?" the officer responds "Ya." It is 12:27 a.m. at this point.

Detective Benson returned briefly at 12:37 a.m. He asked Mr. Wood if he needs "any more water or anything." Ex. C at 18. DW said he was good and the detective then told him that it'll be about five more minutes. DW says that's fine. Detective Benson returns 19 minutes later. Ex. 18 at 00:56:57.

The second round of questioning begins at 12:57 a.m. At first it involved more background and questioning regarding the care of PL, but eventually the detective focused on Mr. Wood. He asked him to demonstrate how he held PL when they were trying to help the child poop. The detective then challenged DW's explanation by telling him what JL said. The detective also showed DW where the doctor said the child's legs were broken within the last couple of days. The detective then described one of the baby's skull fractures. He also told DW that there were other, older injuries to the skull.

The questioning begins to culminate at 1:25 a.m. *See* Ex. 18 at 01:25:10. With some deletions, the questioning prior to the confession is included below:

DET:  If you were investigating this case, D[].
SUSP: Mhmm.
DET:  What are you thinking?
SUP:  Um...
DET:  If you're sittin' in my shoes, and I've got a baby with five different injuries and potentially four injuries to the brain over a period of time.
SUSP: I would think that there was abuse.
DET:  Who's abusing [P.L.]?

4

SUSP: I don't know. That's definitely not [J.L.] and it's not me 'cause I'm not – I – I and I know it's not her dad so I don't . . .

DET: I mean you're the only three.

SUSP: Ya I know.

DET: Do you know who King Solomon is?

SUSP: Kind of. I know he's [sic] in the bible.

DET: Ya considered the wisest man on earth.

SUSP: Ya I didn't know that.

DET: Ya. I had to deal with a dilemma like that [sic] once. I mean it's either you, [J.L.]. . .

SUSP: Or her dad.

DET: Or her dad right?

SUSP: Ya.

DET: I'm thinkin' it's probably not the dad 'cause dad doesn't have a lot of contact with the baby right?

SUSP: Ya.

[. . .]

Det: So If you're in my shoes and I know the baby's being abused and it's being abused by one maybe both of you, right?

SUSP: Mhmm.

DET: Um would you allow [P.L.] to go back into that environment?

SUSP: That's a tough question. [. . .]

DET: Right. How do you think we're gonna' find out for sure what caused those injuries?

SUSP: I don't know. Probably either if one of us did [sic], one of us confesses or I don't know.

DET: Ya I would agree. We know this for a fact that those five injuries are non-accidental.

SUSP: Mhmm.

DET: Do you know what that means?

SUSP: That they were done on purpose?

DET: Ya there wasn't an accident. Accident meaning you know baby's trying to crawl, trying to get up on something and falls over. That's what I'm talking about an accident ok. Um do you think the person who caused these injuries to [P.L.] deserves a second chance?

SUSP: *Pause* Hm *Pause* that's a hard question.

DET: Why is it a hard question?

5

SUSP: 'Cause [. . .] depending [. . .] on who it is and who was doing it, why they did it [. . .] Until he proved himself that he was worthy enough to be able to see him again. I would say no but until then no.

[. . .]

DET: You think that the person would have to come clean?

SUSP: Ya.

DET: Tell everything that happened. So what you're telling me is that the person would truly have to be sorry.

SUSP: Ya.

DET: Right.

SUSP: Ya.

DET: I mean I don't think anybody ever wakes up and . . .

SUSP: Decides they want to abuse a baby?

DET: Right.

SUSP: Ya.

DET: I mean I don't think that happens unless you're a truly evil sadistic person right?

SUSP: Ya.

DET: I don't think you're a truly evil sadistic person um so person would have to be truly sorry and not only promise not to do it again but somehow prove that they weren't going to do that again.

SUSP: Mhmm.

[. . .]

SUSP: I have a question.

DET: Ya.

SUSP: Would you go to jail?

DET: What do you mean?

SUSP: If...ok.

**\*Pause\***

DET: You got something to tell me D[]?

SUSP: Ya I do.

DET: This is how I get this out if you're sorry.

Ex. C at 25-27. At this point, it is 1:36 a.m.

Mr. Wood then confessed. Ex. C at 27 ("I'm the one who did it."). The detective had him describe exactly how he did it; the explanation took about twenty-five minutes.

Ex 18 at 01:37:05-01:51:00. Detective Benson then left once more, asking again if DW needed water or anything; DW requested more water.

The detective returned eight minutes later with a piece of paper, and asked DW to write-out a statement and an apology letter to his son. *Id.* at 29-30. Shortly thereafter, he left again and returned with the cup of water. Ex. 18 at 02:04:56. DW spent forty minutes working on the statement and letter. Ex. 18 at 02:02:46-02:43:49. At around 2:45 a.m., Detective Benson returns and says they are going to transport him to "juvi'." *Id.* at 02:48:22. The video ends with DW still sitting in the room at 2:48 a.m. *Id.* at 02:48:40.

The day after the interrogation, Mr. Wood met with his caseworker. In her presence, he retracted his confession: "I have admitted to all of the injuries, even the ones I didn't do to my son." Report of Proceedings at 102.

The State charged Mr. Wood in Juvenile Court with two counts of second degree assault. A CrR 3.5 hearing was held concerning the admissibility of the confession. The court heard testimony and reviewed a transcript of the interrogation and the video itself. Ultimately, the court ruled that the confession was voluntary and admissible.

The matter proceeded to bench trial. JL testified that she did not harm PL. DW testified that he had twice lashed out against the child, but denied the remainder of the behavior related in his confession. Mr. Wood was adjudicated guilty on both charges.

The court declared a manifest injustice upwards and committed Mr. Wood until age 21. He promptly appealed to this court.

## ANALYSIS

The sole issue presented by this appeal concerns whether the confession was voluntary. Mr. Wood contends that it was not and asks that his confession be suppressed and the convictions reversed and dismissed. Mr. Wood challenges both his waiver of his *Miranda* rights and the overall voluntariness of the confession based on his youth, tired condition, the length of the interrogation process, and allegedly coercive questioning. We agree with the trial court that the confession was voluntary and affirm the convictions.

Established precedent guides our consideration of these arguments. *Miranda* requires that prior to conducting a custodial interrogation, police must first advise a suspect (1) of his right to remain silent and provide notice that anything said to the police might be used against him, (2) of the right to consult with an attorney prior to answering any questions and have the attorney present for questioning, (3) that counsel will be appointed for him if desired, and (4) that he can end questioning at any time. *Miranda*, 384 U.S. at 444. The United States Supreme Court extended the protections of *Miranda* to juveniles in *In re Application of Gault*, 387 U.S. 1, 42-57, 87 S. Ct. 1428, 18 L. Ed. 2d 527 (1967). The court did not require any additional juvenile-specific language be added

8

to supplement the rights identified in *Miranda*, although it noted that "there may well be some differences in technique." *Id.* at 55.

"Whether a juvenile has knowingly and voluntarily waived his *Miranda* rights is determined by a 'totality-of-the-circumstances' approach." *State v. Jones*, 95 Wn.2d 616, 625, 628 P.2d 472 (1981) (quoting *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S. Ct. 2560, 61 L. Ed. 2d 197 (1979)).

> [This approach] permits—indeed, it mandates—inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.

*Id.* (quoting *Fare*, 442 U.S. at 725). However, where a trial court has determined that a *Miranda* waiver was voluntary, appellate courts will not disturb the finding if the record reflects substantial evidence by which the court could have reached that conclusion. *State v. Ng*, 110 Wn.2d 32, 37, 750 P.2d 632 (1988).

In addition to whether a defendant properly waived his or her right to remain silent, a confession can still be involuntary due to the process by which it was obtained. *Massey v. Rhay*, 76 Wn.2d 78, 79, 455 P.2d 367 (1969) (confession coerced by police is not admissible). Courts also apply a totality-of-the-circumstances test to determine if an individual knowingly and voluntarily confessed or instead confessed as product of police

9

coercion. *State v. Unga*, 165 Wn.2d 95, 101, 196 P.3d 645 (2008). The totality-of-the-circumstances test also applies to juveniles. *Id.* at 103.

Under that test, a confession induced by threats or promises that overbear the defendant's will constitutes coercion and must be excluded. *Id.* at 101-102. In addition to the previously noted factors, a court also considers factors relating to the interrogation itself, including its length, location, and continuity. *Id.* at 101, 103 (including both general factors and juvenile factors). An appellate court reviews a trial court's finding that the confession was voluntary and not coercive for substantial evidence. *State v. Broadaway*, 133 Wn.2d 118, 133, 942 P.2d 363 (1997).

There was substantial evidence that the waiver of *Miranda* rights at 10:45 p.m. was knowing and voluntary. Mr. Wood had returned to the hospital after work, spoke with the doctor, and then agreed to speak with officers at the police station. While he cites to evidence showing that he slept later in the evening, nothing suggests that he was that tired three hours earlier or that he did not understand what he was doing when he waived his rights. The trial court viewed the videotape of the interview and could assess Mr. Wood's condition at the time of the waiver. Substantial evidence supports the determination that Mr. Wood validly waived his constitutional rights.

For support of his coercion claim, Mr. Wood argues that juveniles are less mature and less capable of resisting interrogation, that he was fatigued and isolated during a lengthy interrogation that lasted until 2:40 a.m., that JL also was being interrogated, and

10

that the detective threatened not to return PL to a parent's custody without a determination who had harmed the child.[4] Like the trial court, we do not agree with all of Mr. Wood's contentions here. Juvenile maturity, the defendant's fatigue, and the fact that he knew JL also was being questioned were considered part of the circumstances by the trial court. With the exception of fatigue, none of those factors suggested police coercion was taking place. The trial court aptly noted that while the interview took place over a lengthy period of time, there were long periods of time when no questioning was taking place while the officers consulted with each other and with the medical doctor. Indeed, there was nothing accusatory about the interview until the second session was underway. This was not an extended interrogation designed to challenge or break a defendant's story. Instead, it was a slow build up that revealed the relevant information about the incident that gave the detective a basis to elicit a confession.

We likewise agree with the trial judge that the detective did not employ any threats. Pointing out that the adult occupants of the house where the baby lived were suspects and that the baby was not going to be returned until it could be determined who harmed the child did not constitute a threat. It was a simple and logical statement of the problem facing the police, who then asked Mr. Wood's help resolving it.

---

[4] To this end, appellant assigns error to five findings of fact that he contends were not supported by substantial evidence. We address those challenges indirectly in the course of the remaining analysis.

This case has many factual similarities to *Unga*. That case dealt with a 16 ½ year old juvenile with a ninth grade education who was interrogated by police for a brief period. 165 Wn.2d at 108-109. While the interrogation was only about 30 minutes, there was some suggestion of a promise from the officer not to charge the youth. *Id.* at 107, 109. Unga was given *Miranda* warnings, and the court noted that no evidence suggested he did not understand the consequences of waiving his rights. *Id.* at 108. The court found that the confession was voluntary and not the product of coercion from the promise. *Id.* at 113. The court specifically noted that there was no evidence to suggest the officer "used a threatening tone, raised his voice, badgered Unga, attempted to intimidate him, or engaged in other similar tactics." *Id.* at 109. The court also put weight on the brevity of the interrogation, and the fact that there were not multiple rounds of questioning. *Id.*

While this case did not involve a brief interrogation, it also was less confrontational and there was no suggestion of any promises such as occurred there. Like *Unga*, there was a valid waiver of *Miranda* rights. As in *Unga*, DW had a ninth grade education, was given his *Miranda* warnings, appeared to understand his rights, and agreed to talk anyway. Further, the video showed that Detective Benson never used a threatening tone, raised his voice, badgered, or attempted to intimidate DW In fact, the detective told DW that he was not under arrest and they could stop if he got too tired. The detective also offered to get him anything he needed including water on more than one occasion. Finally, Detective

12

Benson's questions here appear to have led DW to want to confess. "[S]o long as that decision is a product of the suspect's own balancing of competing considerations, the confession is voluntary." *Unga*, 165 Wn.2d at 102 (quoting *Miller v. Fenton*, 796 F.2d 598, 605 (3d Cir. 1986).

Considering the totality of the circumstances, we agree that substantial evidence supported the trial court's determination that the confession was voluntarily given. Most certainly, it was not the product of coercion. Accordingly, we conclude that the trial court did not err in admitting the defendant's confession at trial.

The judgment is affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Korsmo, J.

WE CONCUR:

_____
Siddoway, C.J.

_____
Lawrence-Berrey, J.

13