

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 35041-0-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CRAIG FREDRICK CLARK, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — Craig Clark appeals his conviction for third degree rape, contending that the trial court erred in admitting an incriminating recorded interview. He claims he incriminated himself only as a result of police deception.

The deception by police was not as coercively misleading as argued by Mr. Clark and the record supports the trial court's findings that the behavior of law enforcement did not overbear his will to resist. We affirm.

FACTS AND PROCEDURAL BACKGROUND

Craig Clark was contacted at his place of employment one workday in March 2015 by two police detectives, who told him he was a suspect in a crime and they wished

to speak to him about it. They offered him the option of being interviewed at his workplace or at their office, only a few blocks away, where he would have more privacy. Mr. Clark preferred to be questioned at the detectives' quarters and told them he would meet them there. He walked the couple of blocks to their offices and on arrival was escorted to an interview room. He agreed to have the interview recorded and was told that if he wished to stop the interview at any point, he could. He was read *Miranda*[1] warnings, agreed to speak with the detectives, and signed an advisement of rights card.

After some unrelated background questioning, one of the detectives explained that Mr. Clark's 81-year-old stepmother, S.C., alleged that approximately six weeks earlier, when Mr. Clark was visiting her at her home, he had vaginally raped her. After only a few questions, Mr. Clark confessed to having engaged in sexual intercourse with his stepmother, but claimed it was consensual. According to him, he had driven S.C. on errands in the afternoon and had taken her to her home, where they visited in her bedroom. He claimed that they hugged, he became aroused, she began touching his penis, and before he left her home she had performed oral sex on him and they had vaginal intercourse. Mr. Clark was questioned for approximately an hour and 40 minutes, mostly about the details of the sexual contact.

The detectives had obtained a search warrant to obtain a buccal swab from Mr.

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Clark, which they executed at the conclusion of his interview. A couple of weeks later, he was charged with third degree rape, with the aggravating circumstance that he knew or should have known that S.C., who suffers some dementia, was particularly vulnerable or incapable of resistance.

Mr. Clark waived his right to a jury trial, and the CrR 3.5 hearing on the State's intent to offer his recorded interview began on the Thursday before a Monday trial date. Both detectives testified, as did Mr. Clark, and the beginning of the recorded interview was played. Among issues that came up during the hearing was the fact, conceded by the State, that at least one of the detectives lied to Mr. Clark during the interview when she represented that some DNA[2] evidence testing had already been completed. The CrR 3.5 hearing was suspended so that the parties could provide the court with briefing on the significance of the detective's lie.

On the morning of the second day of the bench trial, the trial court announced that it was finding Mr. Clark's recorded interview to be voluntary. It explained that it had reviewed the interview multiple times, looking closely at the "15 or 20 places . . . where I think that there is an argument to varying degrees as to whether law enforcement was completely candid with Mr. Clark about things that they had." Report of Proceedings (RP) at 166-67. Summarizing its ruling, the court said:

---

[2] Deoxyribonucleic acid.

> This doesn't appear to be some elaborate ruse. . . .
>
> I'm satisfied that this was a reasonable investigative technique by Detective Robertson and Detective Koerner. It was a free and voluntary decision by Mr. Clark to engage in this interview. He was not unreasonably coerced.

RP at 191.

At the conclusion of trial, the court found Mr. Clark guilty and specially found that S.C. was particularly vulnerable and incapable of resistance. It sentenced Mr. Clark to 12 months' confinement and 36 months' community custody. He appeals.

## ANALYSIS

Mr. Clark's only assignment of error on appeal is to the trial court admitting into evidence the recorded interview, which he contends was "involuntary, in particular due to the fact that Mr. Clark's interrogators lied to him regarding the DNA evidence in the State's possession." Br. of Appellant at iv.

Washington courts have long held that "[w]hile we do not condone deception, that alone does not make a confession inadmissible as a matter of law." *State v. Braun*, 82 Wn.2d 157, 161, 509 P.2d 742 (1973) (citing *State v. Thompson*, 38 Wn.2d 774, 232 P.2d 87 (1951)). The question whether admission of a confession violates the Fifth Amendment to the United States Constitution and article I, section 9 of the Washington State Constitution depends on whether the confession was involuntary, and for this purpose "'coercive police activity is a necessary predicate to the finding that a confession

4

is not "voluntary."'" *State v. Unga*, 165 Wn.2d 95, 101, 196 P.3d 645 (2008).[3] The

inquiry is whether the defendant's will was overborne by the circumstances surrounding

the giving of the confession. *State v. Broadaway*, 133 Wn.2d 118, 132, 942 P.2d 363

(1997). "[B]oth the conduct of law enforcement officers in exerting pressure on the

defendant to confess and the defendant's ability to resist the pressure are important."

*Unga*, 165 Wn.2d at 101.

"When determining whether a self-incriminating statement was compelled or

made voluntarily, courts look to the totality of the circumstances." *State v. DeLeon*, 185

Wn.2d 478, 486, 374 P.3d 95 (2016). Relevant circumstances include "the 'crucial

element of police coercion'; the length of the interrogation; its location; its continuity; the

defendant's maturity, education, physical condition, and mental health; and whether the

police advised the defendant of the rights to remain silent and to have counsel present

during custodial interrogation." *Unga*, 165 Wn.2d at 101 (quoting *Withrow v. Williams*,

507 U.S. 680, 693-94, 113 S. Ct. 1745, 123 L. Ed. 2d 407 (1993)).

In reviewing a trial court's decision to admit a defendant's confession, we look to

the findings of fact and conclusions of law entered after the CrR 3.5 hearing. *State v.*

---

[3] Mr. Clark devotes a portion of his brief to arguing that we should construe the Washington Constitution as more protective, but the Washington Supreme Court has found that the state and federal constitutional provisions are coextensive. *Unga*, 165 Wn.2d at 100.

*Pierce*, 169 Wn. App. 533, 544, 280 P.3d 1158 (2012). If unchallenged, the findings of fact are verities on appeal. *Id.* Mr. Clark assigns error to only one factual assumption made by the trial court in its oral ruling that was incorporated by reference in its written findings: the assumption that S.C. was taken to a doctor for examination on the day after the alleged rape. At the time the court ruled on the admissibility of Mr. Clark's recorded statement, no evidence had been admitted as to when the rape was alleged to have occurred. There had been testimony that S.C. reported the rape to her caregiver the evening of January 16, 2015, and that her caregiver took S.C. to see a doctor the following Monday, January 19. The evidence therefore does not support the trial court's stated belief that Mr. Clark's stepmother was taken to a doctor for examination "the next day," but establishes only that the rape occurred on or before the evening of Friday, January 16 and S.C. was taken to see a doctor the following Monday, January 19.

The trial court's remaining findings are verities on appeal. They include findings that Mr. Clark voluntarily met with detectives; they did not make any threats, promises, or inducements to compel him to speak with them; he was not prevented from leaving during the interview; he was read his *Miranda* rights, stated he understood them and agreed to waive them; and he did not ask for an attorney, ask the detectives to contact an attorney on his behalf, or request a phone book so that he could contact an attorney himself. Clerk's Papers (CP) at 21. We review de novo whether the trial court's

6

conclusions of law are supported by its factually-supported findings of fact. *Pierce*,

169 Wn. App. at 544.

Mr. Clark's principal focus on appeal is on statements made by a detective early in

the interview that he argues "intentionally deceived him into believing police possessed

DNA linking Mr. Clark to a 'sex act' with [S.C.]." Br. of Appellant at 18. The transcript

of the interview admitted as exhibit 18 identifies Detective Elise Robertson as ER and

Mr. Clark as CC:

> ER:    . . . [T]he reason why we're here is, is basically on an incident that
> actually occurred when you were at [S.C.]'s house in the middle of January.
> Um, *she* uh, *went right after you went to visit, she went in to have an
> examination done because she said there was some sexual activity between
> you and her.  Um, and she provided um, a lot of physical evidence dealing
> with that and the reason why it takes a little while for us to get a hold of
> you is [unintelligible] it takes a while to actually process it to determine
> whether or not there's male DNA and stuff on* . . .
>
> CC:    Mm.
>
> ER:    . . . *the items and stuff, so.  It's not like TV where you have CSI
> where you get* . . .
>
> CC:    Right.
>
> ER:    . . . *it back within an hour so that's, that's the reason why it's taken
> a little while for us to come and, and contact you* and um, so that's why I'm
> wondering what may have happened or occurred when you were over at her
> house on that day.  If it was something like, you know, it sounds to me like
> she has some dementia stuff issues going on um and maybe there was some
> connection or something that maybe did she like possibly think that you
> were her ex-husband instead of her son or something like that.  Could that
> possibly be . . .

CC:    I think, yeah.  Um, yeah.  I think so.

ER:    So, that could've um, maybe some um, some empathy on your part?

CC:    There was um, yes.  Um, I, I'm not going to deny it, we had a um, um, uh . . . some moments and uh, we were just, I don't know[,] it was like a consensual weird, weird thing.  I don't know what the helk [sic] happened.

Ex. 18 at 18 (emphasis added) (most alterations in original).  Within a matter of a few more questions, Mr. Clark confessed to the detectives that there had been intercourse between him and S.C. that was triggered by some hugging, progressing to S.C. performing oral sex on him, to "then I couldn't help myself."  Ex. 18 at 18.  Later on in the interview, detectives made additional representations about having physical evidence.  In actuality, the only physical evidence detectives had at the time they interviewed Mr. Clark was a medical report that upon examination on January 19, S.C. was found to have two very small superficial vaginal tears that were consistent with penetration.

The highlighted statements above are the deception that is critical to Mr. Clark's contention that his will was overborne.  By the time later misrepresentations were made, Mr. Clark had already fully incriminated himself.

Addressing the first component of the voluntariness analysis—Mr. Clark's argument that the detectives' lies exerted great pressure to confess—we are unpersuaded.  He significantly overstates the import of the detective's statements when he likens his case to *State v. Cayward*, 552 So. 2d 971, 973 (Fla. Dist. Ct. App. 1989) in which police

obtained a 19-year-old's confession to assaulting and smothering his niece by presenting

him with bogus scientific reports, manufactured by police, purporting to establish that his

semen was found on the victim's underwear. Mr. Clark argues that he, too, was led to

believe that "the DNA itself would convict him," Br. of Appellant at 8, but while

Detective Robertson claimed to have physical evidence, she did not claim that was

enough to convict him or even tell him what it proved.

Nor would the misrepresentation about S.C. being physically examined "right after

you went to visit" be deception sufficient to overbear Mr. Clark's will. A defendant who

was a stranger to his victim would have understandable concern about the timeliness of

the taking of a rape kit, but Mr. Clark's DNA was not needed to *identify him* as the

alleged rapist. Since S.C. was a single, 81-year-old woman with some significant

physical limitations, any physical evidence of recent vaginal penetration would be solid

evidence supporting her allegation that Mr. Clark raped her during his visit the prior

week.

Evidence of Mr. Clark's ability to resist the pressure created by deception—the

second component of the analysis of voluntariness—is strong. During the interview, his

answers tracked the detectives' questions and he appeared to be calm and thoughtful.

And deceptive statements made by detectives later in the interview did not cause him to

waver from his version of events. When asked by one of the detectives whether the

vaginal sex became "forceful" because "there was a lot of tearing," he did not try to offer

an explanation. Instead, he insisted that he was not rough. Ex. 18 at 22. He was told late in the interview that law enforcement had previously had "extremely excellent success" by swabbing victims' mouths for "male DNA" and none was found in S.C.'s mouth. Ex. 18 at 45. When challenged by a detective that "the only way that'd be possible is there was no blow job," *see id.*, Mr. Clark did not try to explain away the incongruity; he continued to insist that S.C. had performed oral sex on him.

The trial court's findings support its conclusion that Mr. Clark's recorded statement was given voluntarily. The conviction is affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Lawrence-Berrey, C.J.

_____
Fearing, J.

10