# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 49812-0-II |
| Respondent, | |
| v. | |
| ROMEEN AHMAD SABAHI, | UNPUBLISHED OPINION |
| Appellant. | |

Lee, J. — Romeen A. Sabahi appeals his convictions for two counts of first degree assault, arguing that (1) the trial court erred in admitting statements that he made to officers during and after his arrest and (2) there is not sufficient evidence to support his conviction.[1] Because (1) the trial court did not err in admitting Sabahi's statements and (2) sufficient evidence supports the jury's verdict, we affirm.

## FACTS

The State charged Sabahi with two counts of first degree assault—domestic violence for attacking his parents, Ahmad and Minou Sabahi.[2] The State also charged aggravating factors of deliberate cruelty and particularly vulnerable victims.[3]

---

[1] Sabahi also asks us to exercise our discretion and decline to impose costs on appeal. The State has asserted that it will not seek appellate costs. We accept the State's assertion, and no appellate costs will be imposed.

[2] For clarity, the victims and witnesses that have the same last name as the defendant are referred to by their first names. We intend no disrespect.

[3] The State filed an amended information adding two charges of attempted second degree murder with aggravating factors. The jury found Sabahi not guilty of the two counts of attempted second degree murder.

A.    CrR 3.5 HEARINGS

The trial court held CrR 3.5 hearings to determine the admissibility of statements that Sabahi made during and after his arrest. Officer Gunnar Skollingsberg of the Vancouver Police Department testified that he was dispatched to the Sabahis' home in the early morning hours of November 28, 2015, in response to a 911 call. Officer Skollingsberg contacted Sabahi at the bottom of a flight of stairs and placed him in handcuffs. Officer Skollingsberg then asked Sabahi some preliminary questions, such as whether there was anyone else in the house and whether Sabahi was okay. Officer Skollingsberg testified that he asked the preliminary questions to protect officer safety and to determine whether anyone needed medical attention.

When Officer Skollingsberg asked if Sabahi was okay, Sabahi responded that his handcuffs hurt, but Officer Skollingsberg told Sabahi that he would not loosen them. Then Sabahi stated that he could not breathe. Officer Skollingsberg asked why Sabahi could not breathe, and Sabahi responded that he had asthma. Officer Skollingsberg testified that he did not give Sabahi *Miranda*[4] warnings because he was not asking him interrogation questions.

Throughout the contact, Sabahi responded appropriately to Officer Skollingsberg's commands. And Officer Skollingsberg testified,

> [STATE:]  Did the defendant appear[] to be alert?
> [SKOLLINGSBERG:]  Yes.
> [STATE:]  Did he appear to be oriented?
> [SKOLLINGSBERG:]  Yes.
> [STATE:]  Did he express any confusion as to your questions?
> [SKOLLINGSBERG:]  No.

2 Verbatim Report of Proceedings (VRP) at 184.

---

[4] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Detective Michael Day of the Vancouver Police Department contacted Sabahi at the hospital, where Sabahi had been transported for treatment after his arrest, at 6:00 PM on November 28. When Detective Day contacted Sabahi, Sabahi had just woken up so Detective Day asked Sabahi some questions "to see if he was lucid enough to answer any questions or any further questions." 2 VRP at 234. Detective Day asked Sabahi "what the date was, what day it was, what year it was, who the president was, his own name, and what his age was." 2 VRP at 234. Sabahi responded appropriately to the questions. Detective Day then gave Sabahi *Miranda* warnings. Sabahi did not agree to speak to Detective Day any further.

Detective Day also testified regarding Sabahi's demeanor:

[STATE:]  Did the defendant appear to be alert?
[DAY:]  Yes.
[STATE:]  Did he appear to be oriented?
[DAY:]  Yes.
[STATE:]  Did he express any confusion?
[DAY:]  No.

2 VRP at 235.

Sabahi argued that the statements made to Officer Skollingsberg were inadmissible because they were made during custodial interrogation. He asserted that Officer Skollingsberg's questions were an interrogation because there was "a State actor asking him questions that the State, I believe, is now seeking to introduce in an incriminating manner against Mr. Sabahi." 2 VRP at 191. Sabahi also argued that the statements to Detective Day were inadmissible because they were being asked to elicit incriminating responses. The trial court entered written findings of fact and conclusions of law on the CrR 3.5 hearings. The trial court found that Sabahi was alert and oriented during his contact with Officer Skollingsberg. The trial court also found that Sabahi was not

confused by any of Officer Skollingsberg's questions. The trial court concluded that Officer Skollingsberg did not ask Sabahi any custodial interrogation questions, and therefore, *Miranda* warnings were not required. The trial court admitted Sabahi's statements to Officer Skollingsberg.

The trial court also found that Sabahi was alert and oriented during his contact with Detective Day. And the trial court found that Sabahi did not appear to be confused. The trial court concluded that Detective Day's questions "were not designed to elicit an incriminating response[,]" but rather "the purpose of asking these questions was to determine whether [Sabahi] could make any response." Clerk's Papers (CP) at 282. Therefore, the trial court concluded that Detective Day's questions did not amount to a custodial interrogation. The trial court admitted Sabahi's statements to Detective Day.

B.     JURY TRIAL

1.  Victims' Testimony

Ahmad and Minou both testified at Sabahi's jury trial. Ahmad testified that his family was originally from Iran, but they moved to Vancouver, Washington in 1961. Both Sabahi and Minou were in their late eighties at the time of the assault. Sabahi is the youngest of three brothers. Sabahi moved back to his parents' home in November 2015.

Around 3 or 4 AM on November 28, 2015, Ahmad was woken up by Minou. Ahmad called 911. Sabahi was sitting on the floor, making strange noises, and banging his head on the floor. Ahmad tried to make eye contact with Sabahi and repeatedly called his name. Sabahi did not respond. Ahmad testified,

> After so many times, I tried to make eye contact, and he rose like a slowly, like a monster, okay. He was not [Sabahi]. There was a different person. He looking (sic) quite different. Water—sweat was hanging from here, and nose watering, and

4

eyes half open, and tears coming down and crying. I don't know whether it was (inaudible) crying, and banging the head (inaudible).

3 VRP at 315.

Sabahi then began hitting Ahmad repeatedly with his fists. Ahmad tried to move away into the nearby bathroom. Sabahi continued hitting Ahmad. Ahmad was in too much pain to stand, so he dragged himself into his bedroom and closed the door. When the police arrived, Ahmad was taken to the hospital. Ahmad's hip was broken.

Minou testified that she did not remember what happened before the police arrived at her home on November 28, 2015. The trial court admitted the statement Minou made to Detective Day immediately after the assault. Minou stated,

> "I woke up to a growling noise. It was only me, my husband, and my son, [Sabahi]. I went to my son's room, and he was making the noise. I tried to comfort him, but he did not respond. I went and woke up my husband. My husband went to him and asked what's wrong. [Sabahi] was out of control, throwing everything here and there. [Sabahi] got out of control, fighting with my husband and beating him up. [Sabahi] was punching him badly. I called 911. [Sabahi] came to me and beat me up. [Sabahi] pushed me and punched me in my face. I saw him use the weight to smashed (sic) things in the room. The police came, but I could not get over and open the door."

6 VRP at 743-44.

2. Officers and Medical Personnel

Officer Skollingsberg testified that when officers arrived at the Sabahis' residence, they were required to force the door open. When Sabahi saw the officers enter the house, he crawled toward the stairs and rolled down them. Officer Skollingsberg went down the stairs and placed Sabahi in handcuffs. Sabahi was sweating, groaning, and breathing heavily. Officer Skollingsberg asked if Sabahi had any injuries and Sabahi stated that his handcuffs hurt. Officer Skollingsberg

checked the handcuffs and told Sabahi that he was not going to loosen the handcuffs. Sabahi then stated that he could not breathe because he had asthma. Officer Skollingsberg rolled Sabahi onto his side so it would be easier for him to breathe and called for medical personnel.

Sabahi was cooperative with medical personnel. However, when medical personnel informed Sabahi he was not having an asthma attack, Sabahi became agitated. Sabahi began screaming, moaning, and kicking his legs. Officer Skollingsberg believed Sabahi was trying to get up, so he ordered Sabahi to lay on his stomach. Sabahi complied with Officer Skollingsberg's instructions. However, he continued kicking and screaming, so Officer Skollingsberg called for another officer to assist in restraining Sabahi. Officer Skollingsberg testified that Sabahi did not slur his speech or become unconscious during any of his contact with Sabahi.

Shane Orem, a firefighter paramedic for the City of Vancouver, testified at trial that he responded to the Sabahis' home on November 28, 2015. When Orem first contacted Sabahi, Sabahi was sitting up of his own power. Orem testified that Sabahi did not have any emergent medical complaints, and was alert and oriented during the same time period that Officer Skollingsberg had contact with Sabahi. Orem also testified that Sabahi was able to follow instructions and responded appropriately to Orem's questions. Later, Orem observed Sabahi interacting with additional medical personnel and noted that Sabahi was appropriately responding to their questions as well.

Orem also testified that when Sabahi was in handcuffs, Sabahi would roll over onto his side, cry and yell, and try to pull his arms out of the handcuffs. Although Sabahi became agitated when asked about what happened, he was not uncontrollable. And, at times, Sabahi was able to follow commands and instructions.

6

Dr. Janet Shotwell was the emergency room physician who treated Sabahi after the incident. Sabahi was given Haldol, an antipsychotic to treat agitation, multiple times at the hospital, and lorazepam, a sedative used for anxiety or agitation. Shotwell ordered a urine drug screen and a blood screen. Sabahi's urine drug screen was positive for benzodiazepines, opiates, and tricyclic antidepressants. The blood screen was negative for acetaminophen, one component of Tylenol 3. Sabahi was diagnosed with toxic encephalopathy—general confusion or agitation caused by a toxin.

Detective Day testified that he met with Sabahi at the hospital the evening of the assault. Detective Day spoke with Sabahi at approximately 6:00 PM. Sabahi was alert and oriented. Day asked Sabahi a series of questions: he asked Sabahi what day it was and Sabahi responded it was the day after Thanksgiving; he asked Sabahi what month it was and Sabahi responded that it was November; he asked Sabahi what year it was and Sabahi responded that it was 2015; and he asked Sabahi who the President of the United States was and Sabahi responded Obama. Sabahi also gave Detective Day his correct name and age.

Detective Sandra Aldridge of the Vancouver Police Department executed a search warrant at the Sabahis' home following the incident. Detective Aldridge did not find drugs or prescription bottles for Halcion, Norco, Tylenol 3, or Ambien, which are the benzodiazepines and opiates Sabahi reported taking the night of the incident.

3. 911 Recording

The State presented the recording of the 911 call made the night of the assault. The 911 recording documented the assault. Portions of the recording were in English, but some of it

contained Farsi spoken between Ahmad, Minou, and Sabahi. The State and Sabahi each presented translations of the Farsi portions of the 911 recording.

Susan Monghate testified for the State. Monghate testified that she was a court-certified Farsi interpreter. Monghate interpreted the Farsi portions of the 911 recording at trial.

At approximately 4 minutes and 39 seconds into the 911 recording, Monghate testified that Sabahi was saying "Leave me alone" in Farsi. 4 VRP at 477. At 5 minutes and 53 seconds, Minou says "We should—let's go to our room. Let's go to our room." 4 VRP at 478. Minou repeats this three times. At 7 minutes and 55 seconds, Minou repeats "You are very ungrateful" twice. 4 VRP at 478. At 8 minutes and 20 seconds, Minou says, "I can't get up," and "Oh God, oh, God." 4 VRP at 479.

At 10 minutes and 45 seconds, Minou says "killing" and "dad" as a question. 4 VRP at 480. At 11 minutes and 3 seconds, Minou says, "You killed your dad. [Sabahi]. Crazy. [Sabahi]. You killed your dad." 4 VRP at 480. Then, Sabahi says "Always" and "my dad." 4 VRP at 481. And Minou says, "What has he done other than loving you?" and "We love you. We love you so much." 4 VRP at 481. Minou screams and then says, "You already killed me," and "He killed me." 4 VRP at 482. Sabahi responds, "I killed my dad as well." 4 VRP at 482. Then Minou says, "[O]h, god, oh, god," and then, "I can't move. I'm dying. I'm dying. Oh, God, oh, God." 4 VRP at 483. And she says, "You're very ungrateful." 4 VRP at 483. At 13 minutes and 26 seconds, Minou says, "You go away." 4 VRP at 483. And at 14 minutes and 18 seconds, Minou says, "[O]h, god," and is crying. 4 VRP at 484.

Mimi Triglia translated the 911 recording for Sabahi. Triglia testified that at about 11 minutes and 15 seconds, Sabahi says "always father" in a way that is not logical in Farsi. 7 VRP

at 776. Triglia also testified that, at 14 minutes and 36 seconds, Sabahi say "bad kid" but the words were mixed up. 7 VRP at 777-78. The rest of Triglia's translation was consistent with Monghate's translation. Triglia also explained that in Persian culture "crazy" is often used as an idiom for scolding someone and not to mean the person is literally crazy.

    4.  Expert Testimony

Sabahi raised a diminished capacity as a defense. Sabahi's expert, Dr. Nicole Zenger, evaluated whether Sabahi had the ability to form the specific intent for the crime. Dr. Zenger diagnosed Sabahi with persistent depressive disorder and substance-induced delirium at the time of the offense. Dr. Zenger opined that Sabahi's ability to form the specific intent for the crime was impaired at the time of the assault.

Kenn Meneely, a private forensic consultant, testified about the effect of drugs on Sabahi the night of the assault. Meneely testified that a forensic analysis of Sabahi's blood was not performed, so the only information available was the limited information from the hospital's urine drug screen. Meneely testified that Sabahi reported having taken Halcion, Vicodin, Ambien, and Tylenol 3 on the night of the assault.

Halcion is a "hypnotic or a hallucinogenic-type drug" used for sleep. 7 VRP at 795. Halcion interferes with memory, and it can cause aggressive behavior, abnormal thinking, bizarre behavior, and behavioral changes. Sabahi reported that he took 40 Halcion pills, which Meneely testified would be a fatal dose of Halcion.

Tylenol 3 is an acetaminophen with added codeine, and a normal dose of Tylenol 3 is usually one tablet. Sabahi reported that he took four to five Tylenol 3 pills. The general effect of a large dose of Tylenol 3 is sedation.

Vicodin, or Norco, is a narcotic analgesic for pain relief. Sabahi reported that he took 13 Vicodin on the night of the assault. Meneely testified that 13 pills would be a toxic dose of Vicodin, causing the risk of respiratory failure and extreme sedation.

Meneely opined that at the time of the assault, Sabahi was "clearly hallucinating." 7 VRP at 800. And Meneely stated that Sabahi's affect and behavior were the result of the adverse effects of Halcion or the combination of Halcion and Ambien. However, neither Vicodin nor Tylenol 3 interfere with a person's ability to know where they are or what they are doing.

Dr. Simone Viljoen, a forensic evaluator for Western State Hospital, testified on behalf of the State. Dr. Viljoen performed a diminished capacity evaluation of Sabahi. Dr. Viljoen diagnosed Sabahi with "sedative, hypnotic or anxiolytic intoxication; opioid intoxication; [and] major depressive, unspecified recurrent episode[,]" at the time of the assault. 7 VRP at 900.

Dr. Viljoen also testified,

> So despite the fact that he clearly was intoxicated by the opiates and the benzodiazepines that he had taken in an attempt to commit suicide, he still was able to act in a purposeful, goal-directed manner.
>
> . . . .
>
> So his behavior at the time, as I said, although he was depressed, agitated, possibly intoxicated, he was still able to act in a purposeful, goal-directed manner. He was still able to decide what he's going to do and then do it.

7 VRP at 919-20. Dr. Viljoen opined that Sabahi had the "capacity to act intentionally with respect to the charge of assault in the first degree." 7 VRP at 921.

III. VERDICT AND SENTENCE

The jury found Sabahi guilty of two counts of first degree assault. The jury also found that Sabahi knew or should have known that the victims were particularly vulnerable or incapable of

resistance. And the jury found that Sabahi, Ahmad, and Minou were members of the same family or household. Although the jury found aggravating circumstances existed, the trial court declined to impose an exceptional sentence. The trial court imposed a consecutive standard range sentence of 93 months, for a total of 186 months total confinement.

Sabahi appeals.

ANALYSIS

A. SABAHI'S STATEMENTS

Sabahi argues that the trial court erred by admitting the statements he made to Officer Skollingsberg during the arrest and the statements he made to Detective Day during his hospitalization.[5] Sabahi argues that the statements made to Officer Skollingsberg were involuntary, and, therefore, the trial court erred in concluding that the statements were admissible. Sabahi also argues that the statements made to Detective Day were made during a custodial interrogation, and, therefore, the trial court erred by admitting the statements. We disagree that Sabahi's statements to Officer Skollingsberg were involuntary, and any error in admitting Sabahi's statements to Detective Day was harmless.

CrR 3.5 governs the admissibility of a defendant's statements. CrR 3.5(a). We review the trial court's findings of fact following a CrR 3.5 hearing for substantial evidence. *State v.*

---

[5] Sabahi assigns error to several findings of fact in the trial court's CrR 3.5 order. However, Sabahi fails to support these assignments of error with argument or citation to authority. We will not consider assignments of error unsupported by argument or citation to authority. RAP 10.3(a)(6); *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992). Accordingly, we consider the trial court's findings of fact in the CrR 3.5 order verities on appeal. *State v. Alexander*, 125 Wn.2d 717, 723, 888 P.2d 1169 (1995).

*Chambers*, 197 Wn. App. 96, 131, 387 P.3d 1108 (2017). We then review de novo whether the findings support the trial court's conclusions of law. *State v. Chambers*, 197 Wn. App. at 131.

Both the Fifth Amendment to the United States Constitution and Article I, section 9 of the Washington Constitution protect a person from being compelled to give evidence against himself or herself. *State v. Unga*, 165 Wn.2d 95, 100-01, 196 P.3d 645 (2008). "*Miranda* warnings must be given when a suspect endures (1) custodial (2) interrogation (3) by an agent of the State." *State v. Heritage*, 152 Wn.2d 210, 214, 95 P.3d 345 (2004). And, the defendant's statements must be voluntary to be admissible. *Unga*, 165 Wn.2d at 100-01.

1. Statements to Officer Skollingsberg

Sabahi challenges the trial court's conclusion of law 6 in which the trial court concludes that Sabahi's statements to Officer Skollingsberg are admissible. Sabahi argues that the trial court erred in admitting his statements to Officer Skollingsberg because the statements were made involuntarily. We disagree.

We consider the totality of the circumstances to determine whether a defendant's statements were voluntary. *Unga*, 165 Wn.2d at 100. Generally, " 'coercive police activity is a necessary predicate' " to finding that a defendant's statements are not made voluntarily. *Unga*, 165 Wn.2d at 101 (quoting *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986)). And "when a defendant's self-incriminating statements are made in exchange for protection from credible threats of violence while incarcerated, the statements are coerced and involuntary for purposes of the Fifth Amendment." *State v. Juarez DeLeon*, 185 Wn.2d 478, 486, 374 P.3d 95 (2016) (citing *Arizona v. Fulminante*, 499 U.S. 279, 287-88, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991)).

Sabahi does not contend that Officer Skollingsberg took any coercive actions, such as express or implied promises or the exertion of improper influence, to obtain his statements. *See Unga*, 165 Wn.2d at 101. Instead, Sabahi argues that the statements were coerced because it was reasonable for Sabahi to believe that he was required to answer the questions in order to obtain any necessary medical attention. Sabahi relies exclusively on *State v. Juarez DeLeon* to support his argument.

In *Juarez DeLeon*, the defendants disclosed information about their gang affiliations as part of the jail booking process. 185 Wn.2d at 484, 486. The jail staff collects this information to ensure that all inmates are safely housed. *Juarez DeLeon*, 185 Wn.2d at 486-87. Because the defendants made the statements to protect themselves from the "very real risk of violence" that could result from being housed with certain individuals, the statements were not voluntary. *Juarez DeLeon*, 185 Wn.2d at 487.

Here, however, there was no credible threat to Sabahi's safety that necessitated answering the questions. In fact, when Officer Skollingsberg asked Sabahi if he was injured in order to determine whether medical assistance was necessary, Sabahi responded only by saying that his handcuffs were too tight. Later, without any questioning from Officer Skollingsberg, Sabahi stated that he could not breathe because he had asthma. Then Officer Skollingsberg summoned medical personnel. The record shows there was no coercive action taken by Officer Skollingsberg and there was no credible threat that medical treatment would have been withheld. Therefore, Sabahi's statements to Officer Skollingsberg were voluntary, and Sabahi's statements to Officer Skollingsberg were admissible.

2.  Statements to Detective Day

Sabahi challenges the trial court's conclusions of law 3 and 8:

3.  Although the defendant was in custody, the questions asked by Detective Day were not designed to elicit an incriminating response.

. . . .

8.  The defendant's statements to Detective Day are admissible.

CP at 282. Sabahi argues that the trial court erred by admitting his statements to Detective Day because the statements were made during a custodial interrogation. Even assuming, without deciding, that Sabahi is correct, any error in admitting Sabahi's statements to Detective Day is harmless.

"A constitutional error is harmless if the appellate court is convinced beyond a reasonable doubt that any reasonable jury would have reached the same result in the absence of the error." *State v. Guloy*, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985), *cert. denied*, 475 U.S. 1020, 106 S. Ct. 1208, 89 L. Ed. 2d 321 (1986). Detective Day's testimony addressed Sabahi's conduct 12 hours after the assault and after he had been given additional drugs by medical personnel. Therefore, Detective Day's testimony did not likely affect the jury's finding regarding Sabahi's mental state at the time of the assault. We are convinced beyond a reasonable doubt that the jury would have reached the same verdict without the possible error in admitting Sabahi's statements to Detective Day. Accordingly, we affirm because the error was harmless.

B. SUFFICIENCY OF THE EVIDENCE

Sabahi also argues that the evidence was insufficient to support the jury's verdict because the State failed to prove that Sabahi had the specific intent to harm his parents. We disagree.

Evidence is sufficient to support a conviction if, viewing the evidence in the light most favorable to the State, any rational trier of fact can find the essential elements of the crime beyond a reasonable doubt. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). All reasonable inferences from the evidence are drawn in favor of the State and interpreted most strongly against the defendant. *Salinas*, 119 Wn.2d at 201. A claim of insufficiency of the evidence "admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *Salinas*, 119 Wn.2d at 201. Circumstantial and direct evidence are equally reliable. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). "Credibility determinations are for the trier of fact and cannot be reviewed on appeal." *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

To prove first degree assault, the State must prove the defendant assaults another by any force or means likely to produce great bodily harm or death with the intent to inflict great bodily harm. RCW 9A.36.011(1)(a). First degree assault requires proof of the specific intent to inflict great bodily harm. *State v. Thomas*, 123 Wn. App. 771, 779, 98 P.3d 1258 (2004), *review denied*, 154 Wn.2d 1026 (2005).

"If specific intent or knowledge is an element [of the charged crime], evidence of diminished capacity can then be considered in determining whether the defendant had the capacity to form the requisite mental state." *Thomas*, 123 Wn. App. at 779. For a diminished capacity defense, "expert testimony must establish that a 'mental disorder, not amounting to insanity, impaired the defendant's ability to form the culpable mental state to commit the crime charged.'" *Thomas*, 123 Wn. App. at 779 (quoting *State v. Atsbeha*, 142 Wn.2d 904, 914, 16 P.3d 626 (2001)).

Sabahi argues extensively about how his behavior on the night of the assault could support finding that he had diminished capacity, and therefore, he was unable to form the specific intent

to cause great bodily harm to his parents. However, the State presented Dr. Viljoen's expert opinion that Sabahi did have the capacity to form specific intent during the assault. Whether to accept Dr. Viljoen's opinion was a credibility determination solely within the province of the jury and we will not review it on appeal. *See Camarillo*, 115 Wn.2d at 71.

Because there was sufficient evidence to support finding that Sabahi had the capacity to form specific intent during the assault, the jury could use the duration of the assault and the extent of the injuries to infer that Sabahi did act with the specific intent to cause great bodily harm to his parents. *See State v. Wilson*, 125 Wn.2d 212, 217, 883 P.2d 320 (1994) ("Specific intent cannot be presumed, but it can be inferred as a logical probability from all the facts and circumstances."); *State v. Pierre*, 108 Wn. App. 378, 386-87, 31 P.3d 1207 (2001). Accordingly, sufficient evidence supports the jury's verdicts.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Maxa, C.J.

Bjorgen, J.