# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 85627-8-I |
| Respondent, | |
| v. | DIVISION ONE |
| DARIUS CALEB VILLA, | UNPUBLISHED OPINION |
| Appellant. | |

FELDMAN, J. — A jury convicted Darius Caleb Villa of two counts of first degree child molestation and one count of third degree child molestation. On appeal, Villa argues (1) the trial court erroneously denied his motion to suppress statements he made to a detective, (2) the trial court gave an erroneous limiting instruction regarding ER 404(b) evidence, (3) his trial counsel was ineffective in failing to object to this limiting instruction, (4) his sentence violates equal protection principles, and (5) cumulative error denied him a fair trial.

As to Villa's first argument, we conclude the trial court did not err in denying his motion to suppress his statements to the detective. As to Villa's second argument, we conclude the trial court erred in giving a limiting instruction to the jury that improperly allowed (if not directed) it to consider propensity evidence in determining whether the State had proven the elements of the charged crimes and

in assessing the witnesses' credibility. Because this error was not harmless, we reverse Villa's convictions and remand for a new trial on all counts without reaching his other assignments of error.

**I**

**A**

Villa and his family are members of the Divine Covenant International Church, a Christian church located in Burien, Washington. The church frequently organized an overnight Vacation Bible School (VBS) summer camp where the attending children would sleep together in tents. In 2008, when Villa was 13 years old, he attended the VBS with another child, M.J.C., who was 8 years old. M.J.C. recalls that one night while they were sleeping next to each other in a tent Villa unzipped M.J.C.'s sleeping bag, pulled M.J.C. on top of him, reached his hand under M.J.C.'s shorts, and "started rubbing" M.J.C.'s penis over his underwear for approximately five minutes. M.J.C. remembers a similar incident occurring again at the 2011 VBS in which Villa unzipped M.J.C.'s sleeping bag while they slept next to each other in a tent, stuck his hand in M.J.C.'s pants, and began "stroking" M.J.C.'s penis over his underwear for more than 10 minutes.

Another one of Villa's church friends, J.P., also recalls Villa touching him in a similar manner during a sleepover at the Villa house sometime between 2012 and 2015, when Villa was 19 or 20 years old and J.P. was 13 or 14 years old. During the night while they slept next to each other on Villa's bed, Villa started touching J.P.'s thigh and hip area, reached his hands under J.P.'s shorts, and began "rubbing" J.P.'s penis "up and down" in a "jerking motion." J.P.'s penis

became erect, and he could hear Villa making "grunts and sounds of pleasure" during the incident. This incident lasted around five minutes.

M.J.C. and J.P. did not disclose these events until around 2016, when M.J.C. approached J.P. and "started opening up about his situation" involving Villa. M.J.C. and J.P. then shared "stories" about Villa with each other, and they later discussed these events involving Villa with several of their church friends. Approximately two years later, following a Sunday school lesson taught by Villa's mother, Lolita, M.J.C. told Lolita "everything that happened . . . with [Villa]" and said he was "sexually assaulted" by Villa.[1] Lolita was "heartbroken that it happened" and invited M.J.C. to the Villa house to "pray about" the incident alongside Villa and his father, Robert. At the meeting, Villa's parents told Villa and M.J.C. to "forgive each other." M.J.C. then told Villa, "I'm here today . . . in front of your parents because . . . you touched me inappropriately." According to M.J.C., Villa "admitted what he did was wrong," "apologized and said he's not going to do it again," and said, "I'm sorry for what I did to you, I was just . . . following my lust." Later in 2019 (after Villa was charged in this case), Villa left a voicemail on M.J.C.'s phone stating, "[F]rom the bottom of my heart, I just want to ask for your forgiveness. I know it's all in the past, but I just wanted to tell you now . . . I'm truly sorry for all the . . . things that . . . I've done towards you."

In early 2019, one of M.J.C. and J.P.'s friends informed the church's board of directors about their accusations against Villa. The board, which included Robert and Villa's aunt, Leida, chose three of its members, including M.J.C.'s

---

[1] Because Villa's family members share the same last name, we refer to them by their first names for clarity. And because Darius is the defendant here, we refer to him as Villa.

father, to conduct an internal investigation into the allegations. M.J.C.'s father spoke to his son about his allegations. The investigators also met with J.P. and recorded a statement in which J.P. detailed his accusation against Villa. The investigators then met with the Villa family at their house. During this meeting, which lasted several hours, the investigators confronted Villa with allegations that he had "touched some of these kids in the youth group inappropriately," played the recording of J.P.'s interview, and asked Villa "[w]hy do you think they are saying this towards you" and "[d]o you admit to these statements?" Villa initially denied the accusations but eventually said "I just want to get this . . . over with" and "I do not remember. But if—perhaps, if anything that I did towards [J.P.] or to any of these kids, I'm truly sorry." Villa also said, "[W]hat happened to [J.P.]. . . . It was true." The church leaders then organized a "reconciliation" meeting at the church with Villa's family, J.P.'s family, and other church members (but not M.J.C., who had since moved overseas). During this meeting, Villa was "contrite," told J.P. he was "sorry that it happened," and asked J.P. to "please forgive me."

Following this meeting, a church board member reported M.J.C.'s and J.P.'s allegations to Child Protective Services, which referred the matter to law enforcement in March 2019. The case was assigned to Marylisa Priebe-Olson, a detective with the King County Sheriff's Office, who spoke with M.J.C., J.P., and other church members. Priebe-Olson then contacted Villa to get his statement, and they agreed to meet for an interview in Priebe-Olson's car outside of Villa's workplace over his lunch break. During the interview, Villa acknowledged the accusations that he had touched M.J.C. and J.P. "inappropriately" and told Priebe-

Olson that he had apologized to them and asked them for forgiveness. But when Priebe-Olson asked Villa, "What did you apologize for and ask for forgiveness for," Villa replied, "I don't recall what I did." After Priebe-Olson mentioned that M.J.C. and J.P. "can't forgive somebody if somebody is not taking responsibility," Villa initially stated he may have "accidentally" touched J.P.'s penis and suggested, "I was . . . not conscious of what I was doing then." Villa then described how he "grabbed [J.P.] by his thigh and then worked my way up to his genital organ" and remembered "fondling him around in that area." As to M.J.C., Villa stated that "back with the camping, it might have been the same thing with . . . the sleepover at our camp site . . . where I . . . toss and turn over, like, I . . . probably put my shoulders around him." But Villa denied pulling M.J.C. on top of him and touching his penis.

**B**

In September 2019, the State charged Villa with two counts of first degree child molestation relating to the alleged incidents involving M.J.C. in 2008 and 2011 and one count of third degree child molestation relating to the incident involving J.P. which allegedly occurred sometime between 2012 and 2015. Before trial, the State moved under ER 404(b) to "use the evidence that will be admitted throughout the trial as it relates to each count against each victim . . . as evidence of 404(b) under common scheme or plan" and "to show motive, since the State is having to prove in this case that the touching was done for sexual gratification purposes." The prosecutor's motion also sought permission to present evidence of a fourth, uncharged incident involving Villa and M.J.C. sometime after 2008, in

which Villa allegedly awoke M.J.C. during a sleepover at the Villa house and kissed him. In response, defense counsel argued that the ER 404(b) exceptions for common scheme or plan and motive do not apply here and noted, "I don't think they [the prosecutor] can do a 404(b) argument . . . that we're going to use Count 3 against Count[s] 1 and 2 and Counts 1 and 2 against Count 3 . . . [The prosecutor is] trying to combine them all in at this point and make a propensity argument." Defense counsel further stated "if the Court is going to allow that testimony, I would ask that . . . these cases be severed."

The trial court denied Villa's motion to sever, granted the State's ER 404(b) motion, and ruled "the evidence presented . . . does come in under common scheme or plan and motive for sexual gratification." Defense counsel then stated, "I will ask for a limiting instruction to be imposed. . . . [I]t is something that needs to be done." Earlier, in defending the State's ER 404(b) motion and opposing Villa's motion to sever, the prosecutor had stated "a limiting instruction is something that would be more appropriate in terms of a . . . jury instruction that the State would be bound by" because it would "make it very clear to the jurors what the evidence is to be considered for and the reasons for that." Consistent with the prosecutor's earlier suggestion, the trial court agreed a limiting instruction would be "appropriate given the Court's ruling" and "can really assist in keeping jurors focused on what their obligations are and how they are to consider the evidence being presented." Lastly, the court also denied Villa's CrR 3.5 motion to suppress the statements he made to Priebe Olson during the interview in her car.

During trial, M.J.C. testified to the two charged incidents and one uncharged incident involving him and Villa, and J.P. likewise testified to his incident involving Villa. The State also played the audio of Villa's conversation with Priebe-Olson. Villa then testified he did not remember touching M.J.C. or J.P. in a sexual manner and denied having done so. Villa explained that he apologized to M.J.C. and J.P. not because he admitted the truth of their accusations but rather because "forgiveness and reconciliation" are "part of our practice and our faith" and they had "perceived that I did something wrong." Villa and Leida also testified that Villa slept in Leida's cabin during the 2008 VBS, not in the tent with M.J.C.

After the close of evidence, the prosecutor submitted a proposed limiting instruction regarding the ER 404(b) evidence. The instruction states:

> Certain evidence has been admitted in this case for specific purposes, including evidence related to the defendant's motive and/or common scheme or plan. This evidence consists of testimony from M.J.C. and J.P., concerning incidents alleged to have occurred between 2008 and 2015.
>
> This evidence and testimony may be considered by you for purposes of assessing the credibility of the witnesses, assessing whether the State has proven the elements of the crimes charged, and also for assessing the defendant's motive and/or common scheme or plan.
>
> Any evaluation of this evidence during your deliberations must be consistent with this instruction.

Defense counsel questioned the instruction's reference to "motive," and the trial court clarified that its pretrial ruling applied to motive. The court then e-mailed the final instructions, including the limiting instruction, to the parties, and defense counsel replied, "Looks to comply with what the court stated."

So instructed, the jury convicted Villa on all counts. The sentencing court

subsequently imposed concurrent, determinate sentences of 98 months each on counts 1 and 2 and 54 months on count 3. Villa appeals.

## II

## A

Villa first argues the trial court erroneously admitted statements he made to Priebe-Olson, which he claims were involuntary. We disagree.

Both the United States and Washington constitutions provide that persons cannot be compelled in a criminal case to give evidence against themselves. *State v. Unga*, 165 Wn.2d 95, 100, 196 P.3d 645 (2008) (citing U.S. Const. amend. V; Wash. Const. art. 1, § 9). A defendant's incriminating statements may nonetheless be admissible if they voluntarily waive their constitutional right to remain silent. *Id.* Whether a defendant's statements are voluntary depends on the totality of the circumstances, which may include "the 'crucial element of police coercion;' the length of the interrogation; its location; its continuity; the defendant's maturity, education, physical condition, and mental health; and whether the police advised the defendant of the rights to remain silent and to have counsel present during custodial interrogation." *Id.* at 101 (quoting *Withrow v. Williams*, 507 U.S. 680, 693-94, 113 S. Ct. 1745, 123 L. Ed. 2d 407 (1993)). "[W]hen reviewing a trial court's conclusion of voluntariness, an appellate court determines 'whether there is substantial evidence in the record from which the trial court could have found that the confession was voluntary by a preponderance of the evidence.'" *State v. Rafay*, 168 Wn. App. 734, 757-58, 285 P.3d 83 (2012) (quoting *State v. Broadway*, 133 Wn.2d 118, 129, 942 P.2d 363 (1997)).

Here, there is substantial evidence in the record from which the trial court could have found by a preponderance of the evidence that Villa's statements to Priebe-Olson were voluntary. At the time of the interview, Villa was 24 years old and had obtained an associate's degree. When Priebe-Olson initially contacted Villa to "get his statement," she told him she was a "detective" assigned to a case regarding "a meeting at the church." Villa agreed to meet with Priebe-Olson, and this meeting took place over Villa's lunch break outside of his work in Priebe-Olson's car. During this meeting, Priebe-Olson wore plain clothes and kept the vehicle doors unlocked. Before the interview, Priebe-Olson informed Villa that he was not under arrest, read a form advising Villa of his *Miranda*[2] rights—including his rights to remain silent and to have counsel present during the interview—asked Villa if he understood these rights, and told him, "If you don't want to give me your side of the story, then you don't sign [the form] and you leave." Villa replied that he understood his rights and initialed and signed the form. Ultimately, the interview lasted only 42 minutes.

Notwithstanding this evidence showing voluntariness, Villa argues his statements were involuntary due to Priebe-Olson's "material misrepresentation of the legal consequences of Villa responding to her inquiries." In support of this argument, Villa points to the following statement by Priebe-Olson:

> I know when people are younger, that when they struggle with some of that stuff and they just have curiosities, that, you know, they just – they do – it's kind of like playing doctor or just testing the waters, because you're not sure. A lot of that is kind of normal for younger folk. . . . As long as it doesn't continue into you know, your 20s and 30s, that's when . . . there's a problem.

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d. 694 (1966).

According to Villa, Priebe-Olson's statement that "there's a problem" only if such conduct extends past the age of 20 was essentially a "promise" that he would not be prosecuted for the alleged conduct, some of which occurred when Villa was much younger.

Villa's argument is unconvincing in light of our Supreme Court's decision in *Unga*, which squarely addresses these issues. 165 Wn.2d at 109-11. In *Unga*, a detective investigating a stolen, graffitied vehicle told the defendant he "would not be charged 'with the graffiti'" if he told the detective about "another crime." 165 Wn.2d at 98-99, 105 n.2. After the defendant confessed to writing the graffiti and being a passenger in the stolen car, the State charged him with taking a motor vehicle without permission. *Id.* at 98-99. The defendant moved to suppress his statements to the detective on voluntariness grounds, claiming he interpreted the detective's statement as meaning he "would not be charged with any crime in connection with the car." *Id.* at 99.

On appeal from the trial court's denial of the motion, our Supreme Court reiterated that "[w]hether any promise has been made must be determined and, if one was made, the court must then apply the totality of the circumstances test and determine whether the defendant's will was overborne by the promise, i.e., there must be a direct causal relationship between the promise and the confession." *Id.* at 101-02. The court ultimately held the detective's promise not to prosecute the defendant for any offense relating to vandalism of the car, *i.e.*, the graffiti, did not render the defendant's confession to stealing the car involuntary under the totality of the circumstances. As the court explained, the defendant was given *Miranda*

warnings, he was old enough (16 ½ years old) to understand his rights and the consequences of waiving them, the questioning only lasted 30 minutes, the door to the interrogation room was left open, the officer was not in uniform, and the officer did not use intimidating tactics such as raising his voice, using a threatening tone, or badgering the defendant. *Id.* at 109-11.

Priebe-Olson's interrogation tactics were substantially less coercive than those in *Unga*. Notably, Villa does not assign error to the trial court's finding that Priebe-Olson "did not make any promises or threats to him to get Mr. Villa to speak with her." Absent an assignment of error to this finding, we must treat it as a verity on appeal. *Unga*, 165 Wn.2d at 103. Regardless, Priebe-Olson's statements about "hav[ing] curiosities," "playing doctor," and "testing the waters" not being "a problem" during childhood were not a promise not to prosecute. Instead, Priebe-Olson simply said "*a lot of* that is *kind of* normal." (Emphasis added). At no point did Priebe-Olson tell Villa that sexually touching children several years younger than himself was legal or that he would not be prosecuted if he admitted to such conduct.

Additionally, Priebe-Olson advised Villa of his *Miranda* rights and told him, "If you don't want to give me your side of the story, then you don't sign [the form] and you leave." Like the *Unga* defendant, Villa was old enough to understand his rights and the consequences of waiving them, knew Priebe-Olson was a law enforcement officer investigating allegations of sexual misconduct made against him, and was questioned for only 42 minutes. And unlike the *Unga* defendant, who spoke to law enforcement in an interrogation room after being arrested, Villa

was not under arrest and agreed to meet Priebe-Olson in a public location. For these reasons, we are unpersuaded by Villa's argument that Priebe-Olson's purported promise not to prosecute rendered his statements involuntary.

Villa also contends that his statements were involuntary because he only gave them after Priebe-Olson improperly appealed to his religious beliefs. Villa points to Priebe-Olson's remark, after Villa claimed he did not recall the behavior for which he was seeking forgiveness, that she "grew up in . . . a Lutheran church . . . believing that you really can't apologize for something and be forgiven if you don't take responsibility for what it is you did." Villa's argument is unpersuasive given the *Unga* court's holding regarding such conduct:

> A police officer's psychological ploys such as playing on the suspect's sympathies, saying that honesty is the best policy for a person hoping for leniency, or telling the suspect that he could help himself by cooperating may play a part in a suspect's decision to confess, "but so long as that decision is a product of the suspect's own balancing of competing considerations, the confession is voluntary."

165 Wn.2d at 102 (quoting *Miller v. Fenton*, 796 F.2d 598, 605 (3rd Cir. 1986)). Given the numerous circumstances discussed above indicating that Villa knew Priebe-Olson was speaking to him in connection with a criminal investigation and that he could stop speaking to her at any time, Villa's statements—like those in *Unga*—were the product of his own balancing of competing considerations and thus voluntary.

The cases cited by Villa on this issue are inapposite. In *Brewer v. Williams*, 430 U.S. 387, 393, 403-05, 97 S. Ct. 1232, 51 L. Ed. 2d 424 (1977), the Court held that a murder suspect involuntarily waived his right to counsel where police knew

he was "deeply religious and an escapee from a mental hospital" but nonetheless urged him (outside the presence of his attorney) to show them the location of the victim's body because her parents "'should be entitled to a Christian burial for the little girl who was snatched away from them on Christmas [E]ve and murdered.'" Similarly, in *State v. Wood*, 128 S.W.3d 913, 916-18 (Mo. Ct. App. 2004), the court held that a murder suspect's confession was involuntary because he was a "deeply religious man" who had "exhibited signs of mental illness," including believing that "the devil was in him and that he wanted the [church] elders to come and cast it out," and the interrogator was the suspect's minister with whom he had a "personal and priestly relationship." Unlike these defendants, there is no evidence Villa suffered from a serious mental illness such that an appeal to his religious convictions prevented him from weighing the competing considerations of whether to incriminate himself or remain silent. On this record, the trial court did not err in denying Villa's motion to suppress the statements he gave to Priebe-Olson.

**B**

Next, Villa argues the trial court committed reversible error in giving the ER 404(b) limiting instruction—instruction 4—because it improperly permitted the jurors to "consider evidence of each incident as probative of all the offenses" and "failed to admonish [the jury] to not infer criminal propensity from the evidence." We agree.

**1**

ER 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity

therewith." But such evidence may be admissible for "other purposes." ER 404(b). One such other purpose is "motive," which "'goes beyond gain and can demonstrate an impulse, desire, or any other moving power which causes an individual to act.'" *State v. Fuller*, 169 Wn. App. 797, 829, 282 P.3d 126 (2012) (internal quotation marks omitted) (quoting *State v. Baker*, 162 Wn. App. 468, 473-74, 259 P.3d 270 (2011)). Another permissible purpose is to show a "common scheme or plan" in which "'an individual devises a plan and uses it repeatedly to perpetrate separate but very similar crimes.'" *State v. Gresham*, 173 Wn.2d 405, 421-22, 269 P.3d 207 (2012) (quoting *State v. Lough*, 125 Wn.2d 847, 854-55, 889 P.2d 487 (1995)).

Here, Villa was charged with child molestation in the first and third degree, both of which required the State to prove that he had "sexual contact" with a child. *See* RCW 9A.44.083; RCW 9A.44.089. The jury was instructed that "sexual contact" means "any touching of the sexual or other intimate parts of a person done for the purpose of gratifying sexual desires of either party." Relevant here, the State sought to "use the evidence that will be admitted throughout the trial as it relates to each count against each victim . . . as evidence of 404(b) under common scheme or plan" and "to show motive." The State's justification for using the evidence in this manner was to show that Villa touched M.J.C. and J.P. "for sexual gratification purposes." The trial court allowed the State to use this evidence to show "common scheme or plan and . . . motive and intent for sexual gratifications." Villa does not challenge this ruling on appeal, nor does he challenge the court's

related denial of his motion to sever the offense relating to J.P. from those relating to M.J.C. and conduct separate trials.

Instead, Villa challenges the trial court's limiting instruction. If evidence of a defendant's other crimes, wrongs, or acts is admissible under ER 404(b) for a proper purpose, "the defendant is entitled to a limiting instruction upon request." *Gresham*, 173 Wn.2d at 423. "An adequate ER 404(b) limiting instruction must, at a minimum, inform the jury of the purpose for which the evidence is admitted and that the evidence may not be used for the purpose of concluding that the defendant has a particular character and has acted in conformity with that character." *Id.* at 423-24. "This forbidden inference is rooted in the fundamental American criminal law belief in innocence until proven guilty, a concept that confines the fact-finder to the merits of the current case in judging a person's guilt or innocence." *State v. Wade*, 98 Wn. App. 328, 336, 989 P.2d 576 (1999).

The limiting instruction here is egregiously defective. The instruction refers to "testimony from M.J.C. and J.P.[] concerning incidents alleged to have occurred between 2008 and 2015," which encompasses all four incidents of alleged molestation against both victims. It then instructs the jury it may consider this evidence both in "assessing whether the State has proven the elements of the crimes charged" and in "assessing the credibility of the witnesses." Instructing the jury to use evidence of the defendant's other crimes, wrongs, or acts to assess whether the State has satisfied the multiple "elements" of the multiple "crimes" charged is, by definition, instructing the jury to determine whether a defendant has a particular character and has acted in conformity with that character. ER 404(b)

prohibits such an instruction. And under established precedent, ER 404(b) evidence is inadmissible for credibility purposes except where the complaining victim recants or gives conflicting statements about the defendant's conduct. *See State v. Gunderson*, 181 Wn.2d 916, 923-25, 337 P.3d 1090 (2014). That did not occur here. Moreover, the instruction does more than simply permit the use of ER 404(b) evidence for propensity purposes; it states that the jury's "evaluation of this evidence during your deliberations *must* be consistent with this instruction." (Emphasis added). In other words, instruction 4 impermissibly mandated that the jury consider the ER 404(b) evidence for two improper purposes. The trial court thus erred in giving instruction 4.[3]

**2**

The State's brief fails to address Villa's contention that instruction 4 violates ER 404(b).[4] Instead, the State argues we should decline to consider Villa's challenge to instruction 4 because he either waived this argument or invited the claimed error by failing to specifically object to this instruction below and consenting to its inclusion in the court's final jury instructions. We are not persuaded by either argument.

---

[3] Unfettered use of evidence in a single trial involving multiple counts and victims also violates fundamental principles of joinder and severance of offenses. "Severance of charges is important when there is a risk that the jury will use the evidence of one crime to infer the defendant's guilt for another crime or to infer a general criminal disposition." *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). This is especially true where, as here, "the alleged crimes are sexual in nature" because "there is a recognized danger of prejudice to the defendant even if the jury is properly instructed to consider the crimes separately." *Id.* at 884.

[4] Despite appearing to tacitly concede this issue in its brief, the State asserted for the first time at oral argument that instruction 4 did not erroneously instruct the jury in violation of ER 404(b). Wash. Ct. of Appeals oral argument, *State v. Villa*, No. 85627-8-I (Jan. 10, 2025), at 17 min., 06 sec. to 19 min., 02 sec. (on file with court). We generally decline to consider such arguments. *See* RAP 12.1(a) (court "will decide a case only on the basis of issues set forth by the parties in their briefs"); *State v. Ramos*, 24 Wn. App. 2d 204, 213 n.7, 520 P.3d 65 (2022) (declining to address argument raised by the State for the first time at oral argument).

Generally, a party who fails to object to a jury instruction before the trial court waives a claim of error on appeal. *State v. Schaler*, 169 Wn.2d 274, 282, 236 P.3d 858 (2010); RAP 2.5(a). However, our Supreme Court in *Gresham* created an exception to this rule in the context of ER 404(b) limiting instructions by holding, "At least in the context of ER 404(b) limiting instructions, once a criminal defendant requests a limiting instruction, the trial court has a duty to correctly instruct the jury, notwithstanding defense counsel's failure to propose a correct instruction." 173 Wn.2d at 424. Applying this principle to the instant case, once Villa requested an ER 404(b) limiting instruction, the trial court had an independent duty to correctly instruct the jury as to the proper use of this ER 404(b) evidence, notwithstanding defense counsel's failure to propose a correct instruction. Therefore, Villa has not waived his challenge to instruction 4.

*Gresham* also disposes of the State's invited error argument. The invited error doctrine "applies when a party takes affirmative and voluntary action that induces the trial court to take the action that the party later challenges on appeal." *In re Pers. Restraint of Salinas*, 189 Wn.2d 747, 757, 408 P.3d 344 (2018) (quoting 15A KARL B. TEGLAND & DOUGLAS J. ENDE, WASHINGTON PRACTICE: WASHINGTON HANDBOOK ON CIVIL PROCEDURE § 88.4, at 758 (2015 ed.)). Although *Gresham* did not address the invited error doctrine, we reject the State's invitation to apply it here for the same reason the *Gresham* court declined to apply the waiver doctrine in such a scenario, namely that placing the duty to correctly instruct the jury on the trial court, rather than defense counsel, is "more efficient and better prevents the possibility of unfair prejudice than does the alternative of holding that defense

counsel's failure to craft a proper instruction is waiver of the request for a limiting instruction, thereby relegating the defendant to a personal restraint petition alleging ineffective assistance of counsel." 173 Wn.2d at 424-25. And because the invited error cases relied upon by the State do not involve ER 404(b) limiting instructions, they do not control over *Gresham*.[5]

Even if the invited error doctrine could apply here, we would not apply it under these circumstances because defense counsel did not propose the erroneous limiting instruction or affirmatively induce the trial court to give it to the jury; he merely e-mailed the trial court that its final instructions "Look[] to comply with what the court stated." Moreover, the record clearly indicates the prosecutor—not defense counsel—drafted and proposed the erroneous limiting instruction. And it was the prosecutor who initially suggested a limiting instruction in lieu of severing the offenses "to make it very clear to the jurors what the evidence is to be considered for and the reasons for that." The trial court agreed that such an instruction would be "appropriate" and recognized that a "limiting instruction can really assist in keeping jurors focused on what their obligations are and how they are to consider the evidence being presented." Given the prosecutor's shared responsibility for this erroneous limiting instruction, the State's invited error argument easily fails.

---

[5] *See Salinas*, 189 Wn.2d at 754 (public trial right); *State v. Elmore*, 139 Wn.2d 250, 280, 985 P.2d 289 (1999) (misstatement of and judicial comment on evidence); *State v. Studd*, 137 Wn.2d 533, 538, 973 P.2d 1049 (1999) (self-defense instruction); *In re Dep. of K.R.*, 128 Wn.2d 129, 147, 904 P.2d 1132 (1995) (polygraph testimony).

**3**

The State also argues that "[e]ven if [the] jury had been instructed not to consider ER 404(b) evidence for purposes of establishing [Villa's] propensity to molest and action in conformity with that propensity," the error was harmless because the "evidence of his guilt was overwhelming." "Erroneous admission of evidence in violation of ER 404(b) is analyzed under the nonconstitutional harmless error standard—that is, we ask whether there is a reasonable probability that, without the error, 'the outcome of trial would have been materially affected.'" *State v. Gower*, 179 Wn.2d 851, 854-55, 321 P.3d 1178 (2014) (internal quotation marks omitted) (quoting *State v. Smith*, 106 Wn.2d 772, 780, 725 P.2d 951 (1986)). This same standard applies when admissible evidence is erroneously "considered beyond its properly limited purpose." *In re Dep. of A.C.*, 1 Wn.3d 186, 196, 525 P.3d 177 (2023).

We are not convinced this error was harmless. The erroneous instruction 4 severely prejudiced Villa because this was a trial involving sex offenses, where the "potential prejudice from admitting evidence of prior bad acts is 'at its highest.'" *See State v. Gogo*, 29 Wn. App. 2d 107, 117, 540 P.3d 150 (2023) (quoting *State v. Saltarelli*, 98 Wn.2d 358, 363, 655 P.2d 697 (1982)). In a case such as this where "credibility [is] the main issue," highly prejudicial evidence relating to other alleged incidents of molestation perpetrated by the defendant "impermissibly bolster[s] the alleged victim's credibility." *See Gower*, 179 Wn.2d at 858 (citing *Gresham*, 173 Wn.2d at 433). That is especially so here, where the erroneous instruction directed the jury to use the ER 404(b) evidence "in assessing the

credibility of the witnesses." The State relied on this instruction in closing when it told the jury, "You heard in Instruction No. 4 that the testimony of [M.J.C.] and [J.P.] can be considered to assess their credibility," and that the "reasonableness of [M.J.C.'s and J.P.'s] statements . . . weighs heavily in favor of finding [them] credible beyond a reasonable doubt."

Aside from the victims' testimony, the State largely relied on Villa's apologies and requests for forgiveness to prove his guilt. But Villa has presented a plausible, innocent explanation for his apparent admissions of wrongdoing, namely that he was apologizing for how M.J.C. and J.P. felt he had treated them—not for acts he had actually committed—because forgiveness "is a really big part of our Christian walk of our faith." Additionally, Villa never admitted to touching M.J.C.'s penis. And Villa presented an alibi witness, Leida, who testified that he could not have sexually touched M.J.C. in the tent during the 2008 VBS because Villa slept in her cabin to have access to electricity to charge his asthma treatment equipment.

Given the gravity of the prejudice resulting from this error and the lack of overwhelming evidence supporting a case that hinged on witness credibility, we conclude that, within reasonable probabilities, the outcome of Villa's trial would have been materially affected had the trial court not given the erroneous instruction. *See Gunderson*, 181 Wn.2d at 926 (reversing conviction because it was "reasonably probable that absent the highly prejudicial evidence of Gunderson's past violence the jury would have reached a different verdict," even though the remaining evidence "may be sufficient to find Gunderson guilty"). And

although the evidence of guilt is more persuasive as to the count involving J.P. as compared to the counts involving M.J.C., we decline to affirm Villa's conviction on the former and reverse his convictions only on the latter. Under controlling precedent, a partial reversal is only warranted when the error does not affect all counts.[6] Here, in contrast, the erroneous instruction referred to evidence relating to both J.P. and M.J.C. and allowed the jury to use the testimony of one victim to convict on counts involving the other victim. The proper remedy, therefore, is to reverse all of Villa's convictions and remand for a new trial on all counts.

Notwithstanding the above analysis, the State contends the error here is harmless because it resembles the harmless error in *Gresham*. In that case, on appeal from the defendant's convictions for first degree child molestation, the Supreme Court held that the trial court's failure to give a limiting instruction regarding ER 404(b) evidence relating to the defendant's molestation of other children was harmless given the other "overwhelming evidence" of guilt. 173 Wn.2d at 425. This overwhelming evidence included the victim's detailed testimony, the defendant's flight from prosecution, the jury's opportunity to assess the defendant's credibility, and "perhaps most damning, the recorded phone conversation in which [the defendant] all but admits his molestation of [the victim]." *Id.*

---

[6] *See State v. Goodman*, 42 Wn. App. 331, 341, 711 P.2d 1057 (1985) (erroneous denial of motion to suppress evidence relating to items found inside suitcase warranted reversal of conviction for possession of stolen property but not conviction for burglary, which was supported by other "overwhelming" evidence unrelated to the contents of the suitcase); *State v. Pickens*, 27 Wn. App. 97, 101, 615 P.2d 537 (1980) (confrontation clause violation warranted reversal on count supported by that witness's testimony but not on other counts supported by "considerable" evidence that did not depend on the witness's testimony).

*Gresham* is readily distinguishable because the trial court here did not just fail to give a limiting instruction; it gave an instruction that *exacerbated* the prejudice of the ER 404(b) evidence. Additionally, the *Gresham* defendant's "all but admi[ssion]" to molesting the victim was more incriminating than Villa's statements. In *Gresham*, the victim asked the defendant specific questions such as, "Why did you touch me in my vagina" and "[W]hy did you squeeze me and touch me in places that I don't want to be touched?" *Id.* at 416-17. In response, the defendant made statements such as, "I had too many drinks and I really didn't realize what was happening," "I just felt . . . very strongly for you [and] I like you very much, love you and uh I guess I thought [I] was doing the right thing instead of the wrong thing," "I wish it didn't happen," and "I made a mistake." *Id.* In contrast, Villa frequently expressed confusion and surprise at M.J.C. and J.P.'s allegations, claiming that he did not remember sexually touching them and that any such touching would have been done accidentally or subconsciously. Also unlike the *Gresham* defendant, Villa presented an explanation as to why he would apologize and seek forgiveness for acts he did not commit. Because the record here is far less compelling than that in *Gresham* and does not establish harmless error, the State's reliance on *Gresham* is misplaced.

## III

In sum, while the trial court did not err in denying Villa's motion to suppress the statements he made to Priebe-Olson, it erred in giving a limiting instruction that effectively required the jury to consider propensity evidence in determining whether the State had proven the elements of the charged crimes and in assessing the

witnesses' credibility—both of which were impermissible here.  Because this error was not harmless, we reverse and remand for a new trial on all counts without reaching Villa's remaining assignments of error.

_Feldman, J._

WE CONCUR:

_Coburn, J._          _Mann, J._